# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NIKKI BRUNI, JULIE COSENTINO, CYNTHIA RINALDI, KATHLEEN LASLOW, and PATRICK MALLEY, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 14-1197 |
| CITY OF PITTSBURGH, PITTSBURGH CITY COUNCIL, and WILLIAM PEDUTO, in his official capacity as Mayor of the City of Pittsburgh, | ) ) ) ) ) | Judge Cathy Bissoon |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Plaintiffs' Motion for Preliminary Injunction (Doc. 3) and Defendants' Motion to Dismiss (Doc. 15). A hearing took place on December 3, 2014. Upon full consideration of the evidence presented, Plaintiffs' Motion for Preliminary Injunction will be denied, and Defendants' Motion to Dismiss will be granted in part and denied in part.

## A.     Findings of Fact

Section 623.04 of the Pittsburgh Code of Ordinances, titled "Fifteen Foot Buffer Zone," sets forth that:

> [n]o person or persons shall knowingly congregate, patrol, picket or demonstrate in a zone extending fifteen (15) feet from any entrance to the hospital and or health care facility. This section shall not apply to police and public safety officers, fire and rescue personnel, or other emergency workers in the course of their official business, or to authorized security personnel employees or agents of the hospital, medical office or clinic engaged in assisting patients and other persons to enter or exit the hospital, medical office, or clinic.

Pittsburgh, Pa., Code tit. 6, § 623.04 (the "Ordinance"). A permanent injunction altered the Ordinance in 2009, requiring, *inter alia*, that the City clearly demarcate any buffer zone prior to its enforcement. Order Granting Permanent Injunction (the "Injunction" or "Inj."), ECF 2:06-cv-00393, Doc. 85, ¶ 1 (W.D. Pa. Dec. 17, 2009). Presently, two "buffer zones" are delineated and enforced in the City of Pittsburgh, both of which are located outside of reproductive health care facilities where abortions are performed. One of the two buffer zones is indicated by a bright, yellow semi-circle painted around the entrance of 933 Liberty Avenue, the downtown Planned Parenthood clinic ("933 Liberty" or "downtown Planned Parenthood"). The buffer zone outside of that location extends fifteen feet in each direction from the outside edge of the double-door entrance; at its widest point, it is approximately 36 feet long.

Defendants' asserted interests in maintaining the buffer zone Ordinance include "protecting the woman's freedom to get necessary medical care, and insuring public safety and order," in addition to "ensur[ing] that patients have unimpeded access to medical services while ensuring that the First Amendment rights of demonstrators to communicate their message to their intended audience is not impaired." Tr. of Hearing on Mot. For Prelim. Inj. and Mot. To Dismiss, Dec. 3, 2014, ("Tr.") (Doc. 23) at p. 89; Pittsburgh, Pa., Code tit. 6, § 623.01. Prior to the enactment of the Ordinance, there were incidents of physical intimidation, violence and obstruction where the buffer zone now stands. Such incidents have rarely, if ever, occurred since the buffer zone has been implemented.

Plaintiffs regularly engage in anti-abortion activities outside of the buffer zone at the downtown Planned Parenthood. Their advocacy takes the form of "sidewalk counseling," through which they "seek to have quiet conversations and offer assistance and information to abortion-minded women by providing them pamphlets describing local pregnancy resources,

praying, and peacefully expressing this message of caring support to those entering and exiting the clinic." Pl.'s Proposed Findings of Fact and Conclusions of Law (Doc. 25) at p. 8, ¶ 20. Plaintiff Nikki Bruni ("Plaintiff Bruni" or "Mrs. Bruni") began sidewalk counseling at the downtown Planned Parenthood in 2009, after the Injunction invalidated a provision of the Ordinance that had previously banned sidewalk counseling within 100 feet of the clinic entrance. The buffer zone has been in place since before Mrs. Bruni began sidewalk counseling. She regularly engages in prayer, leafleting, sidewalk counseling, and general anti-abortion advocacy outside of the buffer zone's yellow boundary line.

Mrs. Bruni stands directly outside of the buffer zone, approaches potential Planned Parenthood patients, and offers them literature and conversation about alternatives to abortion. If she is walking alongside a Planned Parenthood patient headed towards the clinic entrance, she stops at the buffer zone's boundary. From there, she continues to speak, and outstretches her arm to offer literature. At that point, the patient may continue the approximately five additional steps into the clinic; stop in her tracks and continue to converse with Mrs. Bruni; or exit the buffer zone in order to continue the conversation. All three scenarios have occurred. The buffer zone does not prevent a willing listener from stopping within the zone in order to accept Mrs. Bruni's literature and listen to her message, or from exiting the zone in order to converse with her further. The Ordinance does not prevent Mrs. Bruni or anyone else from engaging in sidewalk counseling with individuals leaving the clinic, once they exit the buffer zone.

Mrs. Bruni believes that she would reach more people if permitted to walk with them for the additional fifteen feet between the edge of the buffer zone and the clinic entrance. It is not often that the women she approaches stop, turn around, and exit the buffer zone in order to continue to speak with her, although this has occurred from time to time. Ninety percent of those

entering the downtown Planned Parenthood facility are doing so for non-abortion-related purposes.

Abortions are performed at the downtown Planned Parenthood on Tuesdays, Fridays and Saturdays. On those days, approximately four to six individuals engage in some form of demonstrating or picketing outside of the buffer zone. More individuals are present during the bi-annual Forty Days for Life campaign. See infra. Paula Harris ("Ms. Harris"), Planned Parenthood Volunteer Coordinator, and Kim Evert, President and CEO of Planned Parenthood of Western Pennsylvania, can hear those outside of the zone speaking in normal, conversational tones, even when they stand at the clinic entrance, the point farthest from the edge of the zone. Patients regularly enter the clinic holding literature given to them by sidewalk counselors.

Defendants have acknowledged that ordinary pedestrian traffic is permitted in the buffer zones. Prior to the December 3, 2014, Motion Hearing, Plaintiff Bruni understood the Ordinance to prohibit sidewalk counselors from walking through the buffer zone in order to reach a patient approaching the clinic from its other side. She stated that the buffer zone forecloses her opportunity to reach those patients for that reason. Defendants clarified that the Ordinance does not prohibit sidewalk counselors from walking through the buffer zone in order to reach a particular audience, as long as they refrain from engaging in sidewalk counseling as they do so. As such, Mrs. Bruni may access potential patients who approach the downtown Planned Parenthood from either side of the zone. Mrs. Bruni acknowledged that it will be easier to engage in sidewalk counseling now that she knows she is permitted to walk through the buffer zone.

Mrs. Bruni has been an organizer and leader of the Pittsburgh Forty Days for Life campaign since 2010. The campaign occurs every spring and fall, and the individuals involved

pray outside of abortion clinics from 7:00 am to 7:00 pm every day for forty days. The participants additionally engage in sidewalk counseling. Plaintiffs do not shout their message, but rather aim to engage women in one-on-one conversation.

The City of Pittsburgh reads the Ordinance to prohibit sidewalk counseling, as a form of "picketing" or "demonstrating," within the demarcated buffer zones. Defendants have not issued any citations for violations of the Ordinance since the Injunction was issued. They have expressed an intent to enforce the Ordinance against those who engage in sidewalk counseling within the buffer zone. Plaintiffs refrain from sidewalk counseling within the demarcated buffer zone for fear of being subjected to penalties of monetary fines and, if violations are repeated, incarceration. See Pittsburgh, Pa., Code tit. 6, § 623.05 (indicating the penalties imposed for violations of the Ordinance).

Defendants have not stated whether they intend to enforce the Ordinance as against agents or employees of the downtown Planned Parenthood and, if they do so intend, what agent or employee actions might constitute a violation of the Ordinance. Plaintiffs accuse Planned Parenthood escorts of congregating and demonstrating within the buffer zone, in violation of the Ordinance. On one occasion, Plaintiff Laslow witnessed an escort stand inside the buffer zone and speak to an anti-abortion advocate, located outside of the zone. She also witnessed escorts standing within the zone, speaking to one another. She does not report the contents of either communication. Ms. Laslow recounts that when she reported her observations to City of Pittsburgh Police Officer Viskovicz, he informed her that the Ordinance did not prohibit these actions, as the escorts are "exempt." Pl.'s Supp. Br. (Doc. 24), Ex. 1 ("Laslow Aff.") at ¶ 8. There is no evidence that Officer Viskovicz made any inquiry into the substance or context of the escorts' statements or actions.

Ms. Harris has been the volunteer coordinator for clinic escorts at the downtown Planned Parenthood for approximately 17 years. She trains and supervises escorts, and volunteers as an escort herself. "A clinic escort is a volunteer who is trained to walk alongside patients and their companions who want to be accompanied as they approach or leave a health care facility." Def.'s Br. in Opp'n. (Doc. 13), Ex. 2 ("Harris Aff.") at ¶ 2. The role of the clinic escort is not to prevent communication between patients and anti-abortion activists; it is to "provide a calming, peaceful, patient-focused presence and to ensure that protests do not endanger patients or impede women's access to medical care." Id. at ¶ 3. Ms. Harris "trains [the] escorts specifically to never engage in political proselytizing of any kind while in the buffer zone because [she] understand[s] that there is a Court order that prohibits that conduct." Id. at ¶ 5.

## B. Procedural History

By way of background and procedural history, the Pittsburgh City Council enacted the Ordinance, supplementing the Pittsburgh Code of Ordinances, in December of 2005. Pittsburgh, Pa., Code tit. 6, §§ 623.01-.07. In relevant part, the Ordinance set forth:

§ 623.03 – EIGHT FOOT PERSONAL BUBBLE ZONE. No person shall knowingly approach another person within eight (8) feet of such person, unless such other person consents, for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education or counseling with such other person in the public way or sidewalk area within a radius of one hundred (100) feet from any entrance door to a hospital and/or medical office/clinic.

§ 623.04 – FIFTEEN FOOT BUFFER ZONE. No person or persons shall knowingly congregate, patrol, picket or demonstrate in a zone extending fifteen (15) feet from any entrance to the hospital and or health care facility. This section shall not apply to police and public safety officers, fire and rescue personnel, or other emergency workers in the course of their official business, or to authorized security personnel employees or agents of the hospital, medical office or clinic engaged in assisting patients and other persons to enter or exit the hospital, medical office, or clinic.

Pittsburgh, Pa., Code tit. 6, §§ 623.03-.04 "Hospital" is defined as:

> An institution that:
> (1) Offers services beyond those required for room, board, personal services and general nursing care; and,
> (2) Offers facilities and beds for use beyond 24 hours by individuals requiring diagnosis, treatment, or care for illness, injury, deformity, infirmity, abnormality, disease, or pregnancy; and,
> (3) Regularly makes available clinical laboratory services, diagnostic X-ray services, and treatment facilities for surgery or obstetrical treatment of similar extent. Hospitals may include offices for medical and dental personnel, central facilities such as pharmacies, medical laboratories and other related uses.

Ordinance § 623.02. "Health care facility," as referenced in section 623.04 of the Ordinance, is not defined therein.

Shortly after taking effect, the Ordinance was challenged as, *inter alia*, facially invalid under the First Amendment. Brown v. City of Pittsburgh, 543 F.Supp.2d 448 (W.D. Pa. 2008) (Fischer, J.). The district court denied the plaintiffs' Motion for a Preliminary Injunction and dismissed several counts of the complaint. Id. The plaintiffs appealed, and the Court of Appeals for the Third Circuit affirmed in part, reversed in part, and dismissed in part. Brown v. City of Pittsburgh, 586 F.3d 263 (3d Cir. 2009). Relevant to the instant motion, the Third Circuit reached the merits of the facial challenge to the Ordinance. It held that the eight foot bubble zone (the "bubble zone") and the fifteen foot buffer zone (the "buffer zone") each individually passed constitutional muster, but when considered in combination, imposed a facially unconstitutional burden on free speech. Id. The Court of Appeals remanded the case back to district court for further proceedings. Id.

Post-remand, the district court ordered that the bubble zone provision at section 623.03 be "permanently enjoined *in toto*." Inj. at ¶ 1. Section 623.04, creating the fixed buffer zone, remained, although the Injunction required that the buffer zone provision be construed to prohibit "all persons" from picketing and demonstrating within the boundaries of the buffer zone. Id. at ¶ 2; see Brown, 586 F.3d at 275 ("We find § 623.04 amenable to the content-neutral

construction urged by the City, that is, an interpretation prohibiting even the exempted classes of persons from 'picketing or demonstrating' within the buffer zone.") (internal alterations omitted).  Accordingly, the exemption for "police and public safety officers, fire and rescue personnel, or other emergency workers in the course of their official business, or to authorized security personnel employees or agents of the hospital, medical office or clinic engaged in assisting patients and other persons to enter or exit the hospital, medical office, or clinic" does not permit those persons to engage in "any action, activity or signage in the form of picketing or demonstrating."  Inj. at ¶ 2.  Rather, it creates an exemption from the ban on congregating and patrolling, but only for emergency personnel "in the course of their official business" and agents/employees of hospitals and health care facilities, insofar as they are engaged in "assisting patients and other persons to enter or exit" the relevant facility.  This exemption is a narrow one; health care facility or hospital employees may not congregate or patrol within the zones unrelated to assisting individuals with facility ingress and egress.  The Injunction further requires that the City provide Pittsburgh City Police with oral and written training materials regarding enforcement of the Ordinance.  Id. at ¶ 3.

On June 26, 2014, the Supreme Court issued its decision in McCullen v. Coakley, striking down the amended Massachusetts Reproductive Health Care Facilities Act (the "MRHCA") as insufficiently narrowly tailored to achieve the Commonwealth's legitimate government interests. 134 S.Ct. 2518 (2014).  The MRHCA as amended "ma[de] it a crime to knowingly stand on a 'public way or sidewalk' within 35 feet of an entrance or driveway to any 'reproductive health care facility,' defined as 'a place, other than within or upon the grounds of a hospital, where abortions are offered or performed." Id. at 2522.  On September 4, 2014, Plaintiffs filed a complaint (the "Complaint") lodging a facial and as applied challenge to the

Ordinance, in light of <u>McCullen</u>.  Compl. at ¶ 1 (Doc. 1).  On September 5, 2014, Plaintiffs

moved the Court to issue a preliminary injunction "to restrain Defendants, and all persons acting

at their command or direction, from enforcing Pittsburgh Code of Ordinance [*sic*] § 623.01 *et.*

*seq.* because it is unconstitutional on its face and as applied to Plaintiffs' and others' expressive

activities."  Pl.'s Mot. for Prelim. Inj.

**C.    Conclusions of Law**

    1.    Motion for Preliminary Injunction

      A party seeking a preliminary injunction must demonstrate the following: (1) a likelihood

of success on the merits; (2) that he or she will suffer irreparable harm if the injunction is denied;

(3) that granting relief will not result in even greater harm to the nonmoving party; and (4) that

the public interest favors such relief.  <u>Miller v. Mitchell</u>, 589 F.3d 139, 147 (3d Cir. 2010) (citing

<u>Child Evangelism Fellowship of N.J. Inc. v. Stafford Twp. Sch. Dist.</u>, 386 F.3d 514, 524 (3d Cir.

2004)).  "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not

be granted unless the movant, by a clear showing, carries the burden of persuasion."  <u>Mazurek v.</u>

<u>Armstrong</u>, 520 U.S. 968, 972 (1997); <u>see also</u> <u>P.C. Yonkers, Inc. v. Celebrations the Party and</u>

<u>Seasonal Superstore, LLC</u>, 428 F.3d 504, 508 (3d Cir. 2005) (holding that the plaintiff bears the

burden of establishing each element in his or her favor before the Court may award this

"extraordinary remedy"); <u>O'Neill v. Twp. of Lower Southampton</u>, 2000 WL 337593, at 1 (E.D.

Pa. 2000) ("The grant of an injunction, prior to a full hearing on the merits, is an extraordinary

remedy and requires Plaintiff to meet a high burden of proof.").  The Court finds that, based

upon the testimony, evidence and arguments presented, Plaintiffs have not met their high burden

of demonstrating a likelihood of success on the merits.

Plaintiffs challenge the Ordinance as a violation of the First and Fourteenth Amendments, but they restrict their Motion for a Preliminary Injunction to a portion of their First Amendment claim. The Court addresses each of their arguments in turn.

### a) Overbreadth

Plaintiffs argue that the Ordinance is facially overbroad, restricting the speech of Plaintiffs and others "at countless locations throughout the City where there is no plausible justification for the ordinance." Pl.'s Mem. in Supp. of Mot. for Prelim. Inj. ("Pl.'s Mem.") (Doc. 4) at 7-8. In support of this argument, Plaintiffs cite the McCullen Court's decision to strike down the MRHCA as violation of the First Amendment, in that it restricted substantially more speech than necessary to protect a compelling government interest. Id. at 8. However, the McCullen Court made such a finding in the context of a narrow tailoring analysis, not an overbreadth one. 134 S.Ct. 2518. In fact, they specifically noted that they "need [not] consider petitioners' overbreadth challenge." Id. at n. 9. As they did not reach the overbreadth issue, they did not alter the relevant doctrine that was applied in Hill v. Colorado, 530 U.S. 703 (2000), and, subsequently, Brown. 586 F.3d 263.

The court of appeals in Brown found that to the extent that Brown brought a facial overbreadth challenge, "her attack is foreclosed by Hill [, 530 U.S. at 730]." 586 F.3d at n. 10, 21. As McCullen is not intervening law on the issue of overbreadth, Hill's application of the overbreadth doctrine remains good law.[1] The Court of Appeals for the Third Circuit's finding, pursuant to Hill, that the Ordinance is not facially overbroad remains binding on this Court. In light of Brown's precedential holding, and the fact that Plaintiffs cite arguments from McCullen's narrow tailoring analysis, Plaintiffs have failed to demonstrate a likelihood of

---

[1] The Court of Appeals for the Third Circuit noted that the Hill Court found "the comprehensiveness of the statute [to be] a virtue, not a vice, because it is evidence against there being a discriminatory governmental motive." 586 F.3d at n. 10 (quoting Hill, 530 U.S. at 731).

success on the merits of a constitutional overbreadth claim.  See <u>Brown</u>, 586 F.3d at n. 10

(holding that "[w]hat the petitioners classified as an 'overbreadth' problem . . . was better

understood analytically as a concern to be addressed within the framework of <u>Ward</u>'s narrow-

tailoring test.") (quoting <u>Hill</u>, 530 U.S. at 731).

    *b)  Content-Based Claim*

    Plaintiffs argue that the Ordinance is "content and viewpoint based on its face," and as-

applied, and is thus subject to strict scrutiny.  Pl.'s Mem. at 12.  The Court first addresses

Plaintiffs' facial content-discrimination challenge.  Again, here, the Court of Appeals for the

Third Circuit has already found the Ordinance to be facially content-neutral.  <u>Brown</u>, 586 F.3d at

270-71, 275 (citing <u>Hill</u>, 530 U.S. 703).  Thus, only if <u>McCullen</u> overruled or altered the content-

neutrality doctrine as set forth in <u>Hill</u> — thereby abrogating <u>Brown</u> — may the Court revisit this

claim.  Plaintiffs have not persuaded the Court that <u>McCullen</u> has altered <u>Hill</u>'s content-

neutrality analysis, and thus they have not demonstrated a likelihood of success on the merits of

a facial content-discrimination challenge.

    The <u>McCullen</u> Court found the MRHCA to be content-neutral.  Rather than ban physical

presence within a fixed buffer zone like the MRHCA, the Ordinance bans congregating,

patrolling, picketing or demonstrating within such a zone.  Pittsburgh, Pa., Code tit. 6, § 623.04.

If an individual is accused of "demonstrating" or "picketing" within the buffer zone, a police

officer may need to inquire as to that person's statements in order to determine if she was

violating the Ordinance or, for example, merely saying "good morning" to her fellow

pedestrians.  Plaintiffs argue that <u>McCullen</u> altered the test for content-neutrality utilized in <u>Hill</u>

when it noted that a law or regulation may be viewpoint-based if it requires "enforcement

authorities to examine the content of the message that is conveyed to determine whether a

violation has occurred." McCullen, 134 S.Ct. at 2531 (quoting F.C.C. v. League of Women Voters of Cal., 468 U.S. 364, 383 (1984)); Pl.'s Mem. at 12. Plaintiffs state that, "[n]otably, this test for content-based speech was rejected in Hill v. Colorado, 530 U.S. 703, 720-24 (2000). But the more recent and unanimous definition set forth in McCullen controls." Id. at fn. 5.

Contrary to Plaintiffs' contentions, McCullen did not overrule the content-neutrality standard applied in Hill. The Hill Court clarifies that a regulation is content-based if its application turns on the *substance* of a communication, not the mode or method of expression. Hill, 530 U.S. at 719-725 (relying on Carey v. Brown, 447 U.S. 455 (1980) as the source of its content-neutrality doctrine). The petitioners in Hill presented an argument similar to Plaintiffs', noting that Colorado's law applied to some, but not all, oral communications within a bubble zone.[2] The Hill Court elucidated that "content" refers to either the topic discussed or the viewpoint expressed, explaining:

> [a]lthough our opinion [in Carey] stressed that "it is the content of the speech that determines whether it is within or without the statute's blunt prohibition," we appended a footnote to that sentence explaining that it was the fact that the statute placed a prohibition on discussion of particular *topics*, while others were allowed, that was constitutionally repugnant. Regulation of the *subject matter* of the messages, though not as obnoxious as *viewpoint*-based regulation, is also an objectionable form of content-based regulation.

Hill, 530 U.S. at 722-23 (internal citations omitted) (emphasis added). It is the need for law enforcement to analyze the substance of speech, resulting in the disproportionate regulation of expression on certain topics or viewpoints, that renders a statute or practice content-based.

---

[2] The Colorado statute only applied when one approached within eight feet of another "for the purpose of . . . engaging in oral protest, education, or counseling." Hill, 530 U.S. at 720. It thus required law enforcement to distinguish between "oral protest, education, or counseling," on the one hand, and all other communications, on the other. The Supreme Court found this to law to be content-neutral.

In contrast, "[i]t is common in the law to examine the content of a communication to determine the speaker's purpose." Id. at 721. In particularly relevant dicta, the Hill Court noted that:

> cases may arise in which it is necessary to review the content of the statements made by a person approaching within eight feet of an unwilling listener to determine whether the approach is covered by the statute. But that review need be no more extensive than a determination whether a general prohibition of "picketing" or "demonstrating" applies to innocuous speech. The regulation of such expressive activities, by definition, does not cover social, random, or other everyday communications. See Webster's Third New International Dictionary 600, 1710 (1993) (defining "demonstrate" as "to make a public display of sentiment for or against a person or cause" and "picket" as an effort "to persuade or otherwise influence"). Nevertheless, we have never suggested that the kind of cursory examination that might be required to exclude casual conversation from the coverage of a regulation of picketing would be problematic.

530 U.S. at 721-22. The Hill Court held that the Colorado statute is content neutral because it "is not limited to those who oppose abortion" and "it applies to all . . . demonstrators whether or not the demonstration concerns abortion." Id. at 725.

Nothing in McCullen indicates tension with the doctrine as set forth in Hill. While the Supreme Court states that "[t]he Act would be content-based if it required enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred," the decision provides no indication that the McCullen Court understands "content" any differently than the Supreme Court did in Hill. McCullen, 134 S.Ct. at 2531. In fact, McCullen makes this statement when specifically addressing an allegation that the application of the MRHCA burdened speech on the topic of abortion more than any other subject matter. This Court finds unpersuasive Plaintiffs' position that the Supreme Court — in one line and without a citation to Hill — intended to radically alter the content-neutrality standard as carefully and thoroughly set forth in that case. Thus, Hill's essential holding is controlling, and

Brown's application of that standard, and conclusion that the Ordinance is facially content-neutral, remains intact and binding on this Court.[3]  See Brown, 586 F.3d at 270-72.

Plaintiffs also argue that the Ordinance is facially content-based because it exempts "facility employees who escort clinic patients into the abortion facility, and by that exemption, exempts their speech."  Pl.'s Mem. at 13-14.  Plaintiffs criticize Defendants' failure to amend the Ordinance in light of the Injunction, and contend that the law discriminates based on viewpoint by permitting clinic escorts to demonstrate and picket within the buffer zone.  The Brown Court found the Ordinance "amenable to the content-neutral construction urged by the City, that is, an interpretation prohibiting even the exempted classes of persons from 'picketing or demonstrating' within the buffer zone."  586 F.3d at 275 (internal alterations omitted).  That construction was later incorporated into the district court's permanent injunction.  Inj. at ¶ 2 ("Defendants shall construe and enforce Section 623.04 of the Ordinance in a manner that does not permit *any person* to picket or demonstrate within the boundaries of the 15 foot buffer zone.") (emphasis added).  Plaintiffs' Memorandum ignores the Court's obligation to follow the

_____

[3] The Court additionally notes that there have been four Supreme Court cases addressing the First Amendment rights of anti-abortion protesters outside reproductive healthcare facilities. The Supreme Court has now found that four differently-worded statutes and injunctions creating buffer or bubble zones around abortion clinics to be content-neutral.  See Madsen v. Women's Health Center, Inc., 512 U.S. 753, 762-764 (1994); Schenck v. Pro-Choice Network of Western New York, 519 U.S. 357 (1997); Hill, 530 U.S. 703; McCullen, 134 S.Ct. 2518.  Notably, in Madsen, the Supreme Court found an injunction banning "congregating, picketing, patrolling, [or] demonstrating,"— as is the case in the City of Pittsburgh's Ordinance — to be content-neutral.  512 U.S. 753, 762-764 (1994).  Most recently, the McCullen Court found the MRHCA to be content-neutral.  In addition, the Court of Appeals for the Third Circuit found Section 623.04 of the Ordinance to be content neutral when it was challenged prior to McCullen.  Brown, 586 F.3d at 275.

As Brown relied not only on Hill for its content-neutrality doctrine, but also on Madsen and Schenck, Plaintiffs must demonstrate that McCullen altered the doctrine in each of those cases in order to make appropriate a second review of the facial content-neutrality of the Ordinance. While our analysis may end with a re-affirmation of the doctrine in Hill, the Court notes that Plaintiffs also have failed to demonstrate that McCullen altered the content-neutrality analysis as espoused in Madsen, Schenck and Brown.

holdings of the Court of Appeals for the Third Circuit, and the previous Injunction, when assessing the Ordinance in the instant case. When questioned about this during the December 3, 2014, hearing, Plaintiffs stipulated that they challenge the law as modified by the Injunction. Tr. at p. 10. As Plaintiffs concede[4] that they challenge the present law, which was deemed content-neutral by the Court of Appeals for the Third Circuit, their argument to the contrary is foreclosed. See Brown, 586 F.3d at 275. For the above reasons, the Ordinance is facially content-neutral, and thus Plaintiffs have not demonstrated a likelihood of success on the merits of a claim that it discriminates based on viewpoint, requiring the application of strict scrutiny. Brown, 586 F.3d at 275 (holding that section 623.04 of the Ordinance, read in light of the City's limiting construction which was later incorporated into the Injunction, is facially content-neutral).

Plaintiffs further argue that the Ordinance is "*applied* in a viewpoint discriminatory manner under McCullen." Pl.'s Mem. at 13 (emphasis added). "Plaintiffs have observed . . . clinic escorts engaging in pro-abortion speech and conduct within the confines of the zone, and the escorts have not been charged with a violation of the Ordinance." Id. As such, Plaintiffs contend that even if the *Ordinance* is not facially content-based, the "*rule* that the City actually enforces, distinct from the ordinance, is content discriminatory and unconstitutional." Hoye v. City of Oakland, 653 F.3d 835 at 849 (emphasis added); McCullen, 134 S.Ct. at 2533-24 (citing Hoye, 653 F.3d at 849-852). In essence, Plaintiffs allege selective enforcement. In spite of Plaintiffs' repeated citations of McCullen with respect to this argument, the McCullen petitioners "nowhere allege[d] selective enforcement," and thus that case is not controlling on this issue. Id. at 2534.

---

[4] The Court notes that no concession on this point is required in order to reach the same conclusion. Any challenges to a version of a law that is no longer in effect necessarily are moot.

A claim of selective enforcement necessarily turns on the facts. On the record here, there remains an issue of fact as to whether the Ordinance is selectively enforced. While no witness testified at the motion hearing about instances of selective enforcement, attached to their supplemental brief, Plaintiffs submitted two affidavits, one by sidewalk counselor Plaintiff Laslow, and the other by counsel for Plaintiffs, Matthew S. Bowman. Pl.'s Supp. Br., Exs. 1-2. Plaintiff Laslow avers that, on December 20, 2014, she witnessed: 1) an escort within the buffer zone speaking to a "pro-life individual" outside of the zone, and 2) two escorts standing within the buffer zone, speaking to one another. Laslow Aff., ¶ 3. She did not report the contents of either conversation. She called the Pittsburgh Police non-emergency line to report an alleged violation of the Ordinance, and left a voicemail. Id. at ¶ 4. Plaintiff Laslow avers that she "believed the escorts standing and speaking in the zone may have violated the buffer zone Ordinance's prohibition on congregating in the zone, and on speaking to one another and to pro-lifers while escorts were in the zone." Id. That same day, she again witnessed escorts standing in the zone, speaking to one another. She again called the non-emergency number and left a voicemail. Id. at ¶ 5. The police did not "come to the scene immediately following [her] reports." Id. at ¶ 6. She encountered Police Officer Viskovicz "at the scene" later that day — he was there on a separate matter — and informed him that she had observed "escorts congregating and conversing in the buffer zone, and calling out to pro-life individuals outside of the buffer zone." Id. at ¶ 7. Officer Viskovicz "informed [her] that the Ordinance does not prohibit escorts from doing any of these things in the zones. He stated that according to Pittsburgh police policy the escorts are exempt, and therefore they may congregate in the zones, speak to each other in the zones, or speak at pro-life individuals who are present outside the zone." Id. at ¶ 8. Mr. Bowman's affidavit alleges that Defendants are permitting escorts to "congregate" within

the buffer zone, and that the City has not stipulated to its understanding that the Ordinance either permits or prohibits clinic escorts from congregating, speaking to each other, and speaking to "pro-lifers" from within the zone. Pl.'s Supp. Br. at Ex. 2 ("Bowman Aff."). [5]

As long as such agents are congregating in connection with "assisting patients and other persons to enter and exit the facility," this is permitted by the Ordinance in light of the Injunction.[6] See Brown, 586 F.3d at 275; Inj. at ¶ 2. Plaintiff Laslow does not provide any facts related to whether the escorts congregating within the buffer zone were engaged in assisting patients to enter or exit the clinic. The Court has no evidence before it that indicates that the escorts were *not* engaged in such assistance — or, more precisely, waiting for patients in order to assist them — at the time they were congregating. Setting aside the misguided contention that escorts may never lawfully congregate within the buffer zone, Plaintiffs seem to understand the Ordinance to prohibit the escorts from speaking to one another within the zone, perhaps as a version of "demonstrating" or "picketing." Pl.'s Mem. at 14 ("Here, the Ordinance allows being

---

[5] As stated *supra,* the Ordinance prohibits congregating, patrolling, picketing or demonstrating within the buffer zone, but exempts "police and public safety officers, fire and rescue personnel, or other emergency workers in the course of their official business, or to authorized security personnel employees or agents of the hospital, medical office or clinic engaged in assisting patients and other persons to enter or exit the hospital, medical office, or clinic." Pittsburgh, Pa., Code tit. 6, § 623.04. The Court of Appeals for the Third Circuit accepted the City's limiting construction of the Ordinance and interpreted its exemption to permit employees or agents of the health care facility to congregate or patrol in the buffer zone, only insofar as they are "engaged in assisting patients and other persons to enter and exit the facility." Brown, 586 F.3d at 275. The exemption does not permit those persons to picket or demonstrate. Id.; Inj. at ¶ 2. It appears that Plaintiffs interpret the Ordinance in light of the Injunction to entirely ban agents and employees of health care facilities from congregating or patrolling; this is an inaccurate interpretation of the law.

[6] Plaintiffs allege that counsel for Defendants indicated that he did not believe that escorts were permitted to "congregate" within the zone. To the extent that counsel indicated as much, the extensively litigated record indicates otherwise. Further, Defendants contend before this Court that the Injunction prohibits health care facility employees from "demonstrating" and "picketing" only. Def.'s Supp. Br. at 3, n. 1. Regardless of Defendants' position, under Brown and the Injunction, escorts may congregate and/or patrol while engaged in assisting patients and others to enter and exit the facility.

in the zone but not speaking, and its exception for clinic employees does not say they cannot speak – it exempts them entirely if they are assisting patients.").  Nowhere does the Ordinance ban speech itself.  Assuming *arguendo* that the escorts are lawfully congregating, as the record contains no indication otherwise, Plaintiffs have not as of yet explained how the escorts' speech to one another while inside the buffer zone constitutes picketing or demonstrating, in violation of the Ordinance.  Pittsburgh, Pa., Code tit. 6, § 623.04.

Lastly, Plaintiffs argue that escorts are impermissibly "speaking," or "calling out" to "pro-lifers," and law enforcement fails to enforce the Ordinance against them.  Bowman Aff. at ¶ 6; Laslow Aff. at ¶ 7.  Once again, the Court lacks a developed factual record on this allegation. Plaintiffs do not provide details about the single specific incident they report to the Court.  There is no evidence, thus far, regarding what the escorts said to the anti-abortion individuals, or the context in which they said it.  Ms. Harris, volunteer coordinator for clinic escorts at the downtown Planned Parenthood, avers that she "trains [her] escorts specifically to never engage in political proselytizing of any kind while in the buffer zone because [she] understand[s] that there is a Court order that prohibits that conduct."  Harris Aff. at ¶ 5.  Without additional facts indicating that the "speaking" or "calling out" constituted "picketing" or "demonstrating," Plaintiffs have not met their burden of persuading the Court that they have a reasonable likelihood of success on a selective enforcement claim.[7]  See Hill, 530 U.S. at 721-22 (noting

---

[7] Like in McCullen, "[i]t would be a very different question if it turned out that a clinic authorized escorts to speak about abortion inside the buffer zone [while assisting patients to enter and exit the facility].  In that case, the escorts would not seem to be violating the Act because the speech would be within the scope of their employment.  The Act's exemption for clinic employees would then facilitate speech on only one side of the abortion debate—a clear form of viewpoint discrimination that would support an as-applied challenge to the buffer zone at that clinic.  But the record before us contains insufficient evidence to show that the exemption operates in this way at any of the clinics, perhaps because the clinics do not want to doom the Act by allowing their employees to speak about abortion within the buffer zones."  134 S.Ct. at 2534.

that law enforcement may permissibly consider the contents of speech in order to distinguish "demonstrating" from casual conversation); <u>P.C. Yonkers</u>, 428 F.3d at 508 (holding that Plaintiffs bear the burden of persuasion when they move for a preliminary injunction). <u>Contrast Hoye</u>, 653 F.3d at 849-851 (finding evidence of selective enforcement after reviewing a police training video, a police training bulletin, a deposition of a police department Captain, and admissions during oral argument).

Due to the undeveloped factual record in this area, Plaintiffs have not met their burden of demonstrating that they are entitled to a preliminary injunction. <u>See</u> <u>Bascom Food Prods. Corp. v. Reese Finer Foods, Inc</u>., 715 F.Supp. 616 (D.N.J. 1989) (holding that the moving party must offer proof beyond unverified factual allegations to demonstrate entitlement to a preliminary injunction). However, while Plaintiffs have not met their high burden with respect to their selective enforcement claim at this preliminary injunction stage, the allegations regarding Officer Viskovicz's discussion with Plaintiff Laslow give it pause. His alleged statement, that the escorts are simply "exempt" from the Ordinance, is inaccurate. As discussed *supra*, the exemption for health care facility employees and agents is a narrow one. Escorts may never "demonstrate" or "picket," and they may "congregate" or "patrol" only insofar as they are engaged in assisting individuals to enter or exit the facility. It strikes the Court that such a narrow exception would require at least a cursory inquiry by law enforcement into the escorts' purpose when congregating, and the subject matter and context of alleged communications by the escorts, especially those directed towards anti-abortion activists. The Court anticipates that discovery will bear out additional details regarding the City of Pittsburgh Police training with respect to the Ordinance, and their enforcement practices. The Court will revisit Plaintiff's

content-discrimination as-applied challenge when the factual record is more developed, as appropriate.

Plaintiffs make a second selective enforcement — or content-based as-applied — argument: while the Ordinance, by its terms, applies at all hospitals and health care facilities, they contend that it is enforced only outside of reproductive health clinics where abortions are performed. Pl.'s Mem. at 14. As such, the Ordinance is "applied in order to restrict speech related to the topic of abortion." Id. It is axiomatic that if Plaintiffs are challenging the "rule that the City actually enforces, distinct from the ordinance, [as] content discriminatory and unconstitutional," there must be evidence that said rule is, in fact, content-discriminatory, and unconstitutional. Hoye v. City of Oakland, 653 F.3d 835, 849. Plaintiffs' arguments do not establish a reasonable likelihood of success on the merits of this alternative theory.

It is the case that only two buffer zones have been demarcated in the City of Pittsburgh, both of which are located outside of reproductive health care facilities where abortions are performed. For the purposes of this analysis, the Court assumes *arguendo* that Defendants are enforcing the "rule" by replacing the phrases "hospital and or health care facility" in the Ordinance with "reproductive health care facility" and/or "abortion clinic." Plaintiffs have not established how such an alteration would render the enforcement content-based.

The Ordinance as enforced in the allegedly viewpoint-discriminatory manner set forth by Plaintiffs (the "rule") bears increasing resemblance to the *content-neutral* MRHCA challenged in McCullen. 134 S.Ct. 2518 (holding the MRHCA, which applied only at reproductive health facilities, to be content-neutral). The petitioners in that case similarly argued that, given the MRHCA applied only at reproductive health care facilities where abortions were performed, "'virtually all speech affected by the [MRHCA] is speech concerning abortion,' thus rendering

[it] content based." McCullen, 134 S.Ct. at 2531 (internal citations omitted). The Supreme

Court disagreed, noting:

> [i]t is true, of course, that by limiting the buffer zones to abortion clinics, the
> [MRHCA] has the "inevitable effect" of restricting abortion-related speech
> more than speech on other subjects. But a facially neutral law does not
> become content based simply because it may disproportionately affect speech
> on certain topics. On the contrary, "a regulation that serves purposes unrelated
> to the content of expression is deemed neutral, even if it has an incidental
> effect on some speakers or messages but not others."

Id. at 2531 (internal citations omitted). Plaintiffs argue that enforcement of the Ordinance more

narrowly than its wording authorizes, evinces Defendants' intent to restrict anti-abortion speech

because of the content of its message. "We cannot infer such a purpose from [the Ordinance's]

limited scope." Id. at 2532. As noted in McCullen, "'States adopt laws to address the problems

that confront them. The First Amendment does not require States to regulate for problems that

do not exist.'" Id. at 2532 (quoting Burson v. Freeman, 504 U.S. 191, 207 (1992) (plurality

opinion)). Legislatures should be encouraged to pursue solutions to problems that "restrict[] less

speech, not more." Id. Given the Supreme Court's determination that a law explicitly creating

buffer zones only at abortion clinics was content-neutral, Plaintiffs have not demonstrated a

likelihood of success on the claim that the similar enforcement of the Ordinance is content-

discriminatory.

c) *Intermediate Scrutiny*[8]

---

[8] In addition to arguing for the application of strict scrutiny due to content-discrimination,
Plaintiffs implore the Court to apply an amorphous heightened level of review, claiming that the
"Supreme Court gives the City no ability to pursue the interests of reducing violence and
obstruction by *restricting speech itself.*" Pl.'s Mem. at 11 (emphasis in original). As a threshold
matter, the Court observes that the Ordinance does not restrict speech per se, but rather is a time,
place and manner regulation. Brown, 586 F.3d at 276 ("As a content-neutral time, place, and
manner regulation, the buffer zone is constitutionally valid if it is narrowly tailored to serve the
government's significant interest and leaves open ample alternative channels of
communication."). As we make clear, such a regulation is subject to intermediate scrutiny, *i.e.*,
the narrow tailoring test. See supra. Contrary to Plaintiffs' position, McCullen declined to hold

As Plaintiffs have not established that the Ordinance is content-based at this juncture, the Ward narrow tailoring test applies. Brown, 586 F.3d at 271-272. The McCullen Court reiterates that:

> [f]or a content-neutral time, place or manner regulation to be narrowly tailored, it must not 'burden substantially more speech than is necessary to further the government's legitimate interests.' Such a regulation, unlike a content-based restriction of speech, 'need not be the least restrictive or least intrusive means of' serving the government's interests. But the government still 'may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.'

134 S.Ct. at 2535 (quoting Ward, 491 U.S. at 798-799); see also Brown, 586 F.3d at 276-77 ("As a content-neutral time, place and manner regulation, the buffer zone is constitutionally valid if it is narrowly tailored to serve the government's significant interest and leaves open ample alternative channels of communication. The zone may be narrowly tailored even if it is not the least restrictive or least intrusive means of serving those interests. . . . 'Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.'") (citing Hill, 530 U.S. at 725-26).

Plaintiffs argue that although McCullen relied on Ward's historic time, place and manner narrow tailoring test, it did so "far more rigorously" than had been done previously. Pl.'s Reply at 2. While Plaintiffs dance around the point, their position is clear: McCullen overruled Hill, upon which the Court of Appeals for the Third Circuit's decision in Brown was based.

---

that no legislative body may ever create any incidental burden on speech if direct regulation of the problematic behaviors — *e.g.* harassment, obstruction, assault, etc. — is a theoretical possibility. Even when applying strict scrutiny, it is not the case that a law may burden no speech. See, e.g., Schenck v. Pro-Choice Network of Western New York, 519 U.S. 357, 358 (1997) ("[T]he challenged provisions [may] ... burden no more speech than necessary to serve a significant government interest.") (quoting Madsen v. Women's Health Center, 512 U.S. 753, 765 (1994)). For those reasons, Plaintiffs contention is unpersuasive, and the Court proceeds to apply intermediate scrutiny, consistent with McCullen and Brown.

Therefore, they argue, this Court must once again consider whether the Ordinance survives intermediate scrutiny. The Court does not agree.

First, the Supreme Court did not explicitly overrule <u>Hill</u> or articulate a deviation from the standard outlined in that case. This Court is unwilling to infer that the <u>McCullen</u> Court covertly overruled <u>Hill</u>, altering the standard iterated in <u>Ward</u>, in direct contradiction of itself. As stated *supra*, the Supreme Court makes clear that it applies a narrow tailoring test in <u>McCullen</u>. The <u>McCullen</u> Court then relies on the very same narrow tailoring test in <u>Hill</u>. This standard also was relied upon in <u>Brown</u> to find that the Ordinance challenged in the instant action survives intermediate scrutiny. As the doctrine on narrow tailoring has not changed since the Court of Appeals for the Third Circuit found section 623.04 to pass constitutional muster, it would be inappropriate for this Court to revisit that determination now. This is particularly true in light of the Injunction, which further narrowed the Ordinance in accordance with the directives of the Third Circuit. If the Supreme Court opted to leave <u>Hill</u> intact in deciding <u>McCullen</u>, far be it for this Court to do otherwise. We are bound by the decision of the Court of Appeals for the Third Circuit. <u>Brown</u>, 586 F.3d at 276 (holding that Section 623.04 of the Ordinance is a constitutional time, place or manner regulation of speech).

The Court further notes that the <u>Brown</u> Court relied not only on the Supreme Court's jurisprudence in <u>Hill</u>, but also in <u>Madsen</u>, 512 U.S. 753 (1994) and <u>Schenck</u>, 519 U.S. 357 (1997):

> In *Madsen* and *Schenck,* the Supreme Court upheld buffer zones extending thirty-six and fifteen feet, respectively, from clinic entrances. As noted, because those buffer zones were established by injunctions rather than generally applicable legislation, they were subject to a more demanding standard of review: the Court asked "whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." The government interests at stake here are significant and largely overlap with those recognized in *Madsen* and *Schenck.* Accordingly, since the Court upheld the

> buffer zones in *Madsen* and *Schenck* (one of which was more than twice as large as the buffer zone here), finding them sufficiently tailored under a test more exacting than the one applicable here, the buffer zone established by the Ordinance is *a fortiori* constitutionally valid.

Brown, 586 F.3d at 276 (internal citations omitted).  Nowhere in McCullen does the Supreme Court invalidate either of those two cases, or even delve particularly deeply into their reasoning.  Hill, Madsen, and Schenck remain good law; those three cases comprise the basis for the previous challenge of the Ordinance, and the Court remains bound by Brown.

In the event that Plaintiffs are arguing that McCullen's *application* of intermediate scrutiny renders the Ordinance invalid, the Court likewise is not persuaded.  The Court could only come to that conclusion if the facts before the Supreme Court were so similar to those in the instant action as to make clear that the decision in Brown was an improper application of the relevant standard.  Given the many factual distinctions between the MRHCA and the Ordinance, the Supreme Court's invalidation of the MRHCA does not render this Ordinance unconstitutional.

First, the burden on speech was significantly greater under the MRHCA, as the buffer zones had a radius of at least 35, not 15, feet, and were implemented statewide.  This Court notes that the difference in the buffer zone coverage is more stark when considered in diameter, or length — the MRHCA created buffer zones *at least* 70 feet long, whereas the buffer zone at the downtown Planned Parenthood is half that.  In two instances, the MRHCA authorized overlapping zones around entrances and driveways creating speech-free areas as much as 93 feet and 100 feet long, respectively.  McCullen, 134 S.Ct. at 2527-28.  The Supreme Court noted that at certain locations the MRHCA forced sidewalk counselors to cross the street from the abortion clinics where they sought to counsel — silencing their conversational speech and foreclosing their ability to place leaflets close to patients' hands — a fact that is not present here.  Id.  The

Supreme Court repeatedly observes the degree of the burden on speech imposed by the MRHCA. See, e.g., id. at 2535 (noting that "the buffer zones impose *serious* burdens on petitioners' speech") (emphasis added); see also id. ("At each of the three Planned Parenthood clinics where petitioners attempt to counsel patients, the zones carve out a *significant portion* of the adjacent public sidewalks, pushing petitioners *well back* from the clinics' entrances and driveways.") (emphasis added). While these emphasized terms are inherently subjective, Plaintiffs have not demonstrated a sufficient factual similarity between the restrictions imposed by the Ordinance here and that imposed by the MRHCA to allow this Court to find that an equally serious burden is placed on Plaintiffs' speech.

Given the nature of sidewalk counseling, it appears that the McCullen petitioners' preferred mode of expression was nearly entirely foreclosed by the buffer zones created by the MRHCA. They were relocated sufficiently far away from entrances and driveways of reproductive health facilities that they were left with the consolation that the MRHCA "does not prevent petitioners from engaging in various [other] forms of 'protest'—such as chanting slogans and displaying signs—outside the buffer zone." Id. at 2536. However, the petitioners were sidewalk counselors, not chanters and sign-holders. The Supreme Court observed that "[i]f all that the women can see and hear are vociferous opponents of abortion, then the buffer zones have effectively stifled petitioners' message." Id. at 2537 (internal citations omitted). The same is simply not true here.

In the instant action, Plaintiffs sidewalk counsel immediately outside the boundary of the buffer zone. They are not pushed across the street, from where they must yell. They are not relegated to a distance so far from the entrance of the downtown Planned Parenthood that they may not approach potential patients in order to hand them literature and speak to them in normal,

conversational tones. Even when Plaintiffs stand at the edge of the buffer zone, they may speak in conversational tones that carry to the facility entrance. With an outstretched arm, they may reach into the zone and offer literature to patients, many of whom accept that literature and bring it into the facility. During the December 3, 2014, hearing, Defendants clarified that anyone may walk through the buffer zone in order to approach a potential patient who is arriving at the clinic from its other side. Plaintiff Bruni acknowledged that this clarification relieves some of the burden she previously believed the Ordinance imposed on her sidewalk counseling.

While Plaintiffs' message is restricted in that they cannot continue to walk alongside women as they approach within fifteen feet of the entrance, that method of communication is not foreclosed or effectively stifled. The Court notes that Plaintiff Bruni did not begin to engage in sidewalk counseling until well after the initial implementation of the Ordinance. It is noteworthy that she has been permissibly engaging in sidewalk counseling, albeit outside of the buffer zone, since 2009. She engages in the very constitutionally protected expression she desires, just not within a small zone surrounding the entrance to the downtown Planned Parenthood. It is clear from her testimony regarding her frequent sidewalk counseling outside of abortion clinics over the past five years that the buffer zone has not foreclosed this form of desired expression nor effectively stifled her message.

Plaintiffs contend that, when relegated to any distance away from the entrance to the downtown Planned Parenthood, it becomes more difficult for them to identity who may be a patient and who is not. The Court does not see this as a burden on their right to free speech. If anything, Plaintiffs engage in more speech — *i.e.* sidewalk counseling — not less, in an effort to disseminate their message to all potential patients. A right to engage in normal conversation and leaflet on a public sidewalk does not equate to a right to know if those with whom you

communicate are, indeed, your target audience. This argument was not articulated in <u>McCullen</u>, and it does not convince the Court that the Ordinance presents an equivalent substantial burden on Plaintiffs' speech to the burden before the Supreme Court in <u>McCullen</u>.

The <u>McCullen</u> Court also noted that the sidewalk counselors in Massachusetts often approach vehicles entering driveways, as 90% of patients arrived by car at one particular clinic. <u>Id</u>. at 2528; <u>see also id</u>. at 2537 ("[Petitioners] claim a right to stand on the public sidewalks by the driveway as cars turn into the parking lot."). It is a greater burden on speech to be distanced from a car than from a pedestrian, as any distance of separation means that the car may easily drive by the sidewalk counselor, entirely insulated from his or her message. <u>Id</u>. at 2536 ("In Worcester and Springfield, the zones have pushed petitioners so far back from the clinics' driveways that they can no longer even attempt to offer literature as drivers turn into the parking lots."). In contrast, the maximum separation between a pedestrian and a sidewalk counselor in Pittsburgh, possibly after passing that counselor before entering the buffer zone, does not create the same burden on speech. As noted, Plaintiffs can and do continue to offer literature to those walking in front of the downtown Planned Parenthood. As would be the case with or without the buffer zone, some patients accept the information, and others do not.

Plaintiffs additionally argue that the Ordinance is like the MRHCA in that it leaves open "no corresponding alternative channel of communication." Pl.'s Reply at 3. It is indeed the case that, in order to be constitutional, the Ordinance must leave open "ample alternative channels for communication." <u>McCullen</u> at 2529 (citing <u>Ward</u>, 491 U.S. at 791). Unlike in <u>McCullen</u>, alternative channels for sidewalk counseling exist in the instant matter. The <u>Brown</u> Court held that, "[a]lthough the buffer zone, standing alone, would require leafletters to remain beyond arm's reach of a medical facilities' entrances, they would still be able to approach individuals

outside of the fifteen-foot radius in order to distribute their literature." 586 F.3d. at 281. In <u>Hill</u>, the Supreme Court "noted approvingly that the bubble zone allowed leafletters to stand stationary in the path of oncoming pedestrians," which is also the case for Plaintiffs fifteen feet away from the clinic entrance. <u>Id</u>. at 278 (citing <u>Hill</u>, 530 U.S. at 727-28). While the Supreme Court found that the MRHCA, with its distinctly larger buffer zone, foreclosed alternative channels of communication such that it impermissibly violated the First Amendment, Plaintiffs have not demonstrated a sufficient factual basis upon which the Court can find that the Ordinance indeed leaves open "no corresponding alternative channel of communication." It is undisputed that Plaintiffs engage currently in sidewalk counseling, some of them multiple times per week. This fact alone is sufficient evidence of the existence of ample alternative channels of communication.

The <u>McCullen</u> Court notes that the Massachusetts legislature pursued their interests "by the extreme step of closing a *substantial portion* of a traditional public forum to all speakers." <u>Id</u>. at 2541 (emphasis added). Given the record before the Court, Plaintiffs have not demonstrated that a similarly "substantial portion" of the sidewalk has been closed by the Ordinance. Due to the factual dissimilarities between <u>McCullen</u> and the instant case with respect to the degree of burden imposed on the petitioners' and Plaintiffs' speech, respectively, the Supreme Court's invalidation of the MRHCA does not compel the invalidation of Pittsburgh's less burdensome Ordinance. Pursuant to <u>Brown</u>, and in light of <u>McCullen</u>, the Ordinance remains narrowly tailored to pursue legitimate government interests.

Plaintiffs raise one additional argument not addressed by <u>Brown</u>, which this Court will consider accordingly. 586 F.3d. 263. Plaintiffs argue that the Ordinance fails narrow tailoring, facially, as it "applies to hospitals and health care facilities," meaning that it creates the ability to

enforce buffer zones outside of, "*inter alia*, dentist offices, out-patient medical laboratories, urgent care facilities, family practitioners, hospitals—the list is endless under the City's incredibly broad definition of 'health care facility,' in order to treat a problem that has historically existed only outside of abortion clinics." Pl.'s Mem. at 10-11.

As discussed *supra*, the government has legitimate interests in "ensuring that patients have unimpeded access to medical services," as well as in "protecting a woman's freedom to seek lawful medical or counseling services in connection with her pregnancy" and "ensuring the public safety and order." Pittsburgh, Pa., Code tit. 6, § 623.01; Brown, 586 F.3d at 269. The Supreme Court in Hill recognized that "[i]t is a traditional exercise of the States' police powers to protect the health and safety of its citizens. That interest may justify a special focus on unimpeded access to health care facilities and the avoidance of potential trauma to patients associated with confrontational protests." 530 U.S. at 715 (internal citations and quotations omitted). McCullen did not overrule Hill's holding. The MRHCA created buffer zones outside of "reproductive health care facilities," and not health care facilities more broadly, in order to pursue a narrower government interest than that asserted here. Thus, the McCullen Court had no opportunity to opine on the issue of whether a broader government interest in regulating sidewalks outside of hospitals and health care facilities is "legitimate," or what kind of law would be narrowly tailored (or not) to preserve that interest. Given Hill's holding that such broad government interests are indeed legitimate, Plaintiffs have not shown a likelihood of success on the claim that an Ordinance regulating the time, place and manner of speech in front of hospitals and health care facilities necessarily fails a narrow tailoring analysis. See Hill, 530 U.S. 703.

d) *Conclusion*

McCullen "noted the historical importance" of Plaintiffs' desired First Amendment expressions — distribution of literature and engagement in personal conversations in a traditional public forum. Pl.'s Mem. at 11; see also Pl.'s Reply at 3-4. The Court understands the constitutional import of Plaintiffs' First Amendment rights. As previously held in Brown, the Ordinance does not unconstitutionally infringe upon those rights, as it is a facially content-neutral time, place or manner regulation of speech. It is narrowly tailored to achieve legitimate government interests, and is thus constitutional on its face. There remains a genuine issue of fact with respect to Plaintiffs' allegation that Defendants engage in selective enforcement of the Ordinance. There is insufficient evidence in the record to support a conclusion that Plaintiffs have established a likelihood of success on the merits of that claim. As Plaintiffs have not demonstrated a likelihood of success on the merits of their First Amendment claims, the Court need not reach the remaining requirements for a successful motion for preliminary injunction. For these reasons, Plaintiffs' Motion for Preliminary Injunction will be denied.

2. Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). When faced with a motion to dismiss, a court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).

*a)  Violation of Freedom of Speech and of the Press under the First Amendment*

Defendants contend that <u>Brown</u> forecloses Plaintiffs' First Amendment freedom of speech claims, and that <u>McCullen</u> did not abrogate <u>Brown</u>.  Def.'s Mot. to Dismiss at ¶¶ 12-22.  However, as noted above, Plaintiffs put forth a selective enforcement claim, alleging that Defendants allow Planned Parenthood escorts to engage in advocacy in the buffer zones, in violation of the Ordinance, while enforcing the Ordinance as against anti-abortion sidewalk counselors.  If we accept their facts as alleged, Plaintiffs indeed state a selective enforcement — or content-based as-applied — claim for relief plausible on its face, under the First Amendment freedom of speech.  <u>See</u> <u>supra.</u>  As set forth above, there remain issues of fact surrounding this particular claim and, as such, dismissal is inappropriate.

Plaintiffs further allege that the Ordinance infringes upon their "freedom of the press, [which] protects the[ir] leafleting activities."  Pl.'s Resp. (Doc. 18) at 10.  Defendants argue that "no facts [are] alleged in support of such cause of action."  Def.'s Mot. to Dismiss at ¶ 6.  "The right of freedom of speech and press has broad scope. . . .This freedom embraces the right to distribute literature."  <u>Martin v. City of Struthers</u>, 319 U.S. 141 (1943).  The Court finds that insofar as Plaintiffs state a selective enforcement claim, their First Amendment freedom of the press is implicated as well.  As such, Defendants' motion for dismissal of Plaintiff's selective enforcement First Amendment freedom of speech and press claim will be denied.

However, Plaintiffs' First Amendment claim is not limited to a theory of selective enforcement, as discussed above.  Compl. at ¶¶ 79-105.  To the extent they allege unconstitutional overbreadth; a failure to survive intermediate scrutiny; facial content-discrimination; content-discrimination as-applied due to the existence of buffer zones only at abortion clinics; and content-discrimination due to the necessity of law enforcement to review

the content of speech in order to enforce the Ordinance, those claims have been addressed by the Court.  See analysis supra.  Insofar as Plaintiffs seek relief pursuant to the First Amendment under these theories, they have not stated a plausible claim for relief, and those iterations of their "First Claim" will be dismissed.  Id.

Plaintiffs further allege that the Ordinance imposes an unconstitutional prior restraint on speech.  Compl. at ¶¶ 95-96.  Defendants argue that Plaintiffs have not stated a claim for relief on this basis, as "[t]he term prior restraint is used to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur."  Def.'s Br. in Supp. (Doc. 16) at 7 (emphasis in original) (quoting Alexander v. United States, 509 U.S. 544 (1993)).  Smolla and Nimmer explain that:

> [t]he phrase "prior restraint" . . . is a term of art referring to judicial orders or administrative rules that operate to forbid expression before it takes place. In First Amendment jurisprudence, prior restraints are thus traditionally contrasted with "subsequent punishments," which impose penalties on expression after it occurs.

Smolla & Nimmer on Freedom of Speech (2014) § 15:1.  The Ordinance, with its imposition of penalties after a violation has occurred, provides "subsequent punishments" and is not a "prior restraint" within the generally understood definition of that term.

Plaintiffs refer to the Supreme Court's discussion of prior restraints in Hill as applicable to the instant challenge.  Pl.'s Resp. at 9.  However, that analysis was relevant in Hill only because the petitioners specifically challenged the Colorado statute's requirement that sidewalk counselors obtain a pedestrian's consent before approaching within eight feet, in order to engaging in oral protest, education, or counseling.  The Supreme Court declined to deem that a prior restraint.  Hill, 530 U.S. at 733 (noting that the Supreme Court had previously rejected the prior restraint argument in Schenck and Madsen, and rejected it once again with respect to Colorado's statute).  Moreover, the Ordinance here does not contain any such consent

requirement, or any other element that could be considered a prior restraint on speech. Contrary to Plaintiffs' arguments, it is the case here, as it was in <u>Hill</u>, that "[u]nder this statute, absolutely no channel of communication is foreclosed. No speaker is silenced. And no message is prohibited." <u>Id</u>. at 734. For these reasons, Plaintiffs have not stated a prior restraint claim on which relief could be granted. That claim will be dismissed.

Plaintiffs allege that the Ordinance is impermissibly vague pursuant to the First Amendment, failing to "put a reasonable person on notice of what it prohibits, and lacks the clarity required of restrictions on protected speech." Compl. at ¶ 97. Defendants argue that "[t]he Ordinance – especially as it is construed in light of the permanent injunction – clearly prohibits certain activities within the 15 foot 'buffer zone,'" and thus the Court should dismiss Plaintiffs' void for vagueness claim. Def.'s Br. in Supp. at 8. Plaintiffs do not respond to Defendants' motion to dismiss their unconstitutional vagueness claim. Upon review of the factual allegations in the Complaint, no facts alleged support this challenge. Nowhere do Plaintiffs allege that they are not on reasonable notice of what the Ordinance prohibits. Rather, Plaintiffs make clear in the Complaint that they understand the Ordinance to prohibit them from sidewalk counseling, congregating, patrolling or otherwise demonstrating or picketing, within the buffer zone. Compl. at ¶ 66. As Plaintiffs have failed to state a First Amendment void for vagueness claim for relief, that claim will be dismissed.

For the reasons stated, Plaintiffs' First Amendment Claim remains insofar as they allege selective enforcement, or content-discrimination as-applied. The remaining iterations of their First Amendment claim for relief will be dismissed.

*b) Violation of Substantive and Procedural Due Process under the First and Fourteenth Amendments*

Defendants allege that the gravamen of Plaintiffs' substantive due process claim under the Fourteenth Amendment relates to the alleged suppression of their freedom of speech. Def.'s Br. in Supp. at 3. "Therefore, the First Amendment, rather than the Fourteenth Amendment's notion of substantive due process provides the proper context for analyzing this claim." Id. (citing Albright v. Oliver, 510 U.S. 266 (1994)). "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." Albright, 510 U.S. at 273; see also Donahue v. Gavin, 280 F.3d 371 (3d Cir. 2002) (citing Albright, 510 U.S. 266).

Plaintiffs contend that the Fourteenth Amendment protects their fundamental rights to freedom of speech and of the press, and thus a substantive due process challenge is proper. Pl.'s Resp. at 12; see generally Compl. at ¶¶ 107-12, 117-18. They argue that said fundamental rights are deprived in an arbitrary or capricious manner, as Defendants do not create and enforce buffer zones at every location where authorized to do so. Id. They reason that "Defendants are impermissibly and arbitrarily targeting Plaintiffs because of their speech related to abortion, and their pro-life speech in particular." Id.

The First Amendment is the proper constitutional home for Plaintiffs' freedom of speech and press claims; "substantive due process, with its scarce and open-ended guideposts, can afford [them] no relief." Albright, 510 U.S. at 274. Plaintiffs have alleged no facts to support an allegation that Defendants enforce the Ordinance in an "arbitrary or capricious" manner. Rather, they allege that Defendants enforce the Ordinance in a manner that specifically aims to burden speech on abortion generally, and anti-abortion speech in particular. These allegations are better

suited for challenge under the First Amendment, which provides an "explicit textual source of constitutional protection" for impermissible abridgments of freedom of speech and the press. Plaintiffs have properly alleged that the Ordinance targets abortion-related, or anti-abortion, speech in their content-based First Amendment challenge, further demonstrating that the First Amendment is the source of their rights, and the more appropriate authority for their claim for relief.

To the extent that Plaintiffs allege a substantive due process challenge based on the City's impermissible "unfettered discretion" to demarcate and enforce additional buffer zones, they have also not stated a claim for relief. See Pl.'s Resp. at 11-13. Plaintiffs cite a number of cases for the proposition that such broad discretion would violate their substantive due process rights. Id. Problematically, none of those citations relate to an analysis under the substantive due process doctrine of the Fourteenth Amendment. Cox v. Lousiana, 379 U.S. 536, 558 (1965) ("But here it is clear that the practice in Baton Rouge allowing unfettered discretion in local officials in the regulation of the use of the streets for peaceful parades and meetings is an unwarranted abridgment of appellant's freedom of speech and assembly secured to him by the *First Amendment*. . . ") (emphasis added); Se. Promotions, Ltd. v. Conrad, 420 U.S. 546, 553 (1975) (noting that "the danger of censorship and of abridgment of our precious *First Amendment* freedoms is too great where officials have unbridled discretion over a forum's use") (emphasis added); City of Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750 (1988) (analyzing the constitutional limits on discretion required by the First Amendment); Forsyth County v. Nationalist Movement, 505 U.S. 123 (discussing impermissibly arbitrary application of prior restraints on speech pursuant to the First Amendment).

As Plaintiffs' substantive due process claims are more appropriately characterized as violations under the First Amendment, they fail to state a claim upon which relief may be granted under the Fourteenth Amendment.

Defendants argue that Plaintiffs' procedural due process claims "should be dismissed because the protections of procedural due process do not extend to generally applicable legislative actions." Def.'s Br. in Supp. at 3. Plaintiffs cite only one case, Winters v. New York, 333 U.S. 507 (1948), for the proposition that procedural due process is implicated when a statute limits the freedom of expression "yet fails 'to give fair notice of what acts will be punished and such a statute's inclusion of prohibition against expressions, protected by the First Amendment.'" 333 U.S. at 509-10. Winters was an appeal of a criminal conviction under a New York statute. Id. The due process clause of the Fourteenth Amendment was implicated because of the procedural posture of a criminal appeal — appellant was deprived of due process and freedoms of speech or press via his prosecution for violating the statute. The instant matter is not a criminal prosecution. There are no allegations that Plaintiffs have been subjected to any state proceedings in which any process would come due to them. The crux of their argument is, rather, that the Ordinance is unconstitutionally vague, failing to give them fair notice of what First Amendment expressions, if any, it covers. This argument is better suited to a First Amendment analysis. Albright, 510 U.S. at 273; see analysis supra. Defendants' motion to dismiss Plaintiffs procedural due process claim will be granted.

c)  *Claims as against Mayor William Peduto and Pittsburgh City Council*

Defendants request that the Court dismiss Mayor William Peduto ("Mayor Peduto") from this action, as "official capacity suits are the equivalent of suing the government entity itself." Def.'s Br. in Supp. at 3 (citing Kentucky v. Graham, 473 U.S. 159 (1985)). They further argue

that the Pittsburgh City Council should be terminated as a defendant as well, as the City of Pittsburgh is the "real party in interest and . . . also a named defendant." Id. at 4.

Plaintiffs charge Mayor Peduto with "executing and enforcing" the Ordinance, allegedly in a content-discriminatory manner; the Pittsburgh City Council is charged with enacting the Ordinance. Compl. at ¶¶ 16-19. It would be premature to dismiss Mayor Peduto at this early stage, prior to discovery with respect to Plaintiffs' selective enforcement claim and Mayor Peduto's role, if any, in such enforcement. It is commonplace to name multiple defendants, "whether corporate, municipal, or individual" in Section 1983 claims such as this one. Compl. at ¶ 6; Coffman v Wilson Police Dep.'t, 739 F.Supp. 257, 262 (E.D. Pa 1990) (citing Pembaur v. City of Cincinnati, 475 U.S. 469, 473-74 (1986) (city, county, police chief, county sheriff, Board of County Commissioners, prosecutor, and police officers all named as defendants); Graham, 473 U.S. at 161-62 (local law enforcement and city named as defendants)). In contrast, Plaintiffs make no meaningful allegations regarding the role of Pittsburgh City Council in the enforcement of the Ordinance. Defendants' motion to dismiss Mayor Peduto from this case will be denied. Their motion to dismiss all claims as against the Pittsburgh City Council will be granted.

*d) Conclusion*

For the reasons stated, Defendants' Motion to Dismiss Plaintiffs' First Amendment claims will be granted in part and denied in part. To the extent that Plaintiffs allege a selective enforcement, or content-discriminatory as-applied, First Amendment claim, Defendants' motion will be denied. In all other respects, Defendants' Motion to Dismiss Plaintiffs' First Amendment claims is granted. Defendants' Motion to Dismiss Plaintiffs' substantive and procedural due process claims is granted. Defendants' motion to dismiss all claims as against Mayor Peduto

will be denied.  Their motion to dismiss all claims as against the Pittsburgh City Council will be granted.

The Court notes that in Defendants' "wherefore clause," they additionally seek dismissal of Plaintiffs' "*Third*" claim as it relates to the Fourteenth Amendment.  Plaintiffs' Third Claim is rooted in the Fourteenth Amendment's equal protection clause.  Defendants, however, present no arguments on Plaintiffs' equal protection theory.  Indeed, there is no other reference to the equal protection claim in Defendants' Motion to Dismiss or Brief in Support.  As such, the Court will not *sua sponte* dismiss this claim.

## ORDER

For the reasons stated above, Plaintiffs' Motion for Preliminary Injunction (**Doc. 3**) is **DENIED.**  Defendants' Motion to Dismiss (**Doc**. **15**) is **DENIED** insofar as it seeks to dismiss: 1) Plaintiffs' First Amendment freedom of speech and press selective enforcement claim, and 2) all claims as against Mayor William Peduto.  Defendants' Motion to Dismiss is **GRANTED** in all other respects.

Defendants shall file their Answer on or before March 20, 2015.

IT IS SO ORDERED.


March 6, 2015                                              s\Cathy Bissoon
                                                          Cathy Bissoon
                                                          United States District Judge


cc (via ECF email notification):

All Counsel of Record