**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| NIKKI BRUNI, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 14-1197 |
| | ) | |
| CITY OF PITTSBURGH, *et al.*, | ) | Judge Cathy Bissoon |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

### I.  MEMORANDUM

Pending before the Court are Plaintiffs' Motion for Summary Judgment (Doc. 68) and

Defendants' Motion for Summary Judgment (Doc. 69).  Upon full consideration of the evidence

presented, Plaintiffs' Motion for Summary Judgment will be denied, and Defendants' Motion for

Summary Judgment will be granted.

**A.**     **Factual Background**

1.  The Ordinance

In December 2005, the Pittsburgh City Council adopted Ordinance No. 49, Bill No.

2005-1944, supplementing the Pittsburgh Code of Ordinances, Title 6: Conduct, Article I:

Regulated Rights and Actions, by adding Chapter 623, entitled "Public Safety at Health Care

Facilities."  Pittsburgh Code of Ordinances § 623.01 *et seq.*, (the "Ordinance").  Plaintiffs'

Concise Statement of Material Facts (Doc. 74) ¶ 1; Defendants' Response to Plaintiffs' Concise

Statement of Material Facts (Doc. 82) ¶ 1.  The Ordinance became effective on December 30,

2005.  Doc. 74 ¶ 1; Doc. 82 ¶ 1.

In relevant part, the challenged Ordinance provides as follows:

§ 623.04 FIFTEEN-FOOT BUFFER ZONE

No person or persons shall knowingly congregate, patrol, picket, or demonstrate in a zone extending 15 feet from any entrance to the hospital and or health care facility. This section shall not apply to police and public safety officers, fire and rescue personnel, or other emergency workers in the course of their official business, or to authorized security personnel employees or agents of the hospital, medical office or clinic engaged in assisting patients and other persons to enter or exit the hospital, medical office, or clinic.

Doc. 74 ¶¶ 2, 140; Doc. 82 ¶¶ 2, 140. The Ordinance exempts "authorized security personnel employees or agents of the hospital, medical office or clinic engaged in assisting patients and other persons to enter or exit the hospital, medical office, or clinic" from the entirety of Section 623.04. Doc. 74 ¶ 141; Doc. 82 ¶ 141.

In adopting the Ordinance, the City Council also ratified a preamble, titled "Intent of Council," that described the goals the City sought to accomplish as follows:

The City Council recognizes that access to Health Care Facilities for the purpose of obtaining medical counseling and treatment is important for residents and visitors to the City. The exercise of a person's right to protest or counsel against certain medical procedures is a First Amendment activity that must be balanced against another person's right to obtain medical counseling and treatment in an unobstructed manner; and The City of Pittsburgh Bureau of Police has been consistently called upon in at least two locations within the City to mediate the disputes between those seeking medical counseling and treatment and those who would counsel against their actions so as to (i) avoid violent confrontations which would lead to criminal charges and (ii) enforce existing City Ordinances which regulate use of public sidewalks and other conduct; Such services require a dedicated and indefinite appropriation of policing services, which is being provided to the neglect of the law enforcement needs of the Zones in which these facilities exist. The City seeks a more efficient and wider deployment of its services which will help also reduce the risk of violence and provide unobstructed access to health care facilities by setting clear guidelines for activity in the immediate vicinity of the entrances to health care facilities; The Council finds that the limited buffer and bubble zones outside health care facilities established by this chapter will ensure that patients have unimpeded access to medical services while ensuring that the First Amendment rights of demonstrators to communicate their message to their intended audience is not impaired.

Doc. 74 ¶ 7; Doc. 82 ¶ 7.

A permanent injunction altered the Ordinance in 2009, requiring, *inter alia*, that the City clearly demarcate any buffer zone prior to its enforcement. Order Granting Permanent Injunction (the "Injunction"), Civil Action No. 06-393, Doc. 85, ¶ 1 (W.D. Pa. Dec. 17, 2009). Presently, two "buffer zones" are delineated and enforced in the City of Pittsburgh, both of which are located outside of reproductive health care facilities where abortions are performed. Doc. 74 ¶ 149; Doc. 82 ¶ 149. One of the two buffer zones is indicated by a bright, yellow semi-circle painted around the entrance of 933 Liberty Avenue, the downtown Planned Parenthood clinic ("933 Liberty" or "downtown Planned Parenthood"). Doc. 74 ¶¶ 111, 122; Doc. 82 ¶¶ 111, 122. The inside of the yellow arc measures 15 feet in radius from the center of the closed front doors of the Planned Parenthood facility. Doc. 74 ¶ 123; Doc. 82 ¶ 123.

According to the City, the Ordinance "applies to any type of protesting within the buffer zone." Doc. 74 ¶ 155; Doc. 82 ¶ 155. However, "purely social or random conversations (like going up to someone to ask directions or what time it is) are not intended to be covered by the Ordinance." Doc. 74 ¶ 156; Doc. 82 ¶ 156. When Plaintiffs filed this lawsuit, they believed that the Ordinance completely prohibited their passage through the buffer zone, even if they were not engaging in sidewalk advocacy during such passage. Defendants' Concise Statement of Material Facts (Doc. 71) ¶ 86; Plaintiffs' Response to Defendants' Concise Statement of Material Facts (Doc. 79) ¶ 86. However, since then, the City has explained to Plaintiffs that the buffer zone does not apply to "individuals who are simply walking through the 15 foot zone to get to from one location to another, provided that such passage does not obstruct access to the facility." Doc. 74 ¶ 87; Doc. 82 ¶ 87; Doc. 74 ¶ 154; Doc. 82 ¶ 154. For purposes of this lawsuit, there appears to be no dispute that "sidewalk counseling" within the 15 foot buffer zone is prohibited.

2.  <u>History of the Ordinance</u>

Prior to moving to 933 Liberty Avenue, Planned Parenthood maintained its downtown location on Fifth Avenue.  Doc. 74 ¶ 112; Doc. 82 ¶ 112.  In the mid- and late-1990's, there were numerous incidents involving violence, disruption and obstruction of entrances at the Fifth Avenue location.  Doc. 71 ¶ 1; Doc. 79 ¶ 1.  As a result, in the mid-90's, Pittsburgh police deployed crowd-control barriers outside abortion clinics in order to maintain order and security, separating demonstrators from each other and from patients attempting to visit the clinic for health care.  Doc. 71 ¶ 4; Doc. 79 ¶ 4.  After Planned Parenthood moved to the 933 Liberty Avenue location in 2002, the incidents became less frequent and severe; however, there still were regular incidents involving "pushing," "shoving" and "verbal harassment" at the downtown Planned Parenthood.  <u>See</u> Def. App., Ex. J, Hohos Dep. (Doc. 72-10) at 31:23-32:12 ("New location was, like I said, not as severe, but we still had our incidents. We still had the pushing and the shoving between the escorts and the pro-life folks and, you know, the blocking of the doors, that was still occurring when people would sit in front of doors.  Not on a much regular basis as before, but that -- that conduct still continued to a large -- to a large degree. A lot of it was verbal.  Depending on which side the argument you were on or the cause, a lot of it was verbal harassment between both parties, both sides."); <u>id</u>. at 42:2-5 (Sergeant William Hohos explaining that he has personally witnessed "pro-life individuals forcing literature into patients' pockets"); <u>id</u>. at 52:13-15 ("We were still very active between the years of 2002 to 2005.  'We' being the police.").  To mitigate these incidents, the Bureau of Police employed an overtime detail of police officers stationed outside the downtown Planned Parenthood.  Doc. 71 ¶ 6; Doc. 79 ¶ 6.

On December 29, 2003, the City of Pittsburgh was declared a financially distressed municipality by the Commonwealth of Pennsylvania's Department of Community and Economic Development. Doc. 71 ¶ 14; Doc. 79 ¶ 14. Following the determination of the City's distressed status, the Bureau of Police discontinued the overtime detail of police officers assigned to the downtown Planned Parenthood, although police would still respond to 911 or other specific calls for law enforcement. Doc. 71 ¶ 19; Doc. 79 ¶ 19. Thereafter, on November 29, 2005, the Ordinance was introduced before the City Council. Doc. 74 ¶ 126; Doc. 82 ¶ 126. A committee meeting was held on December 7, 2005, followed by hearing for public comment on December 13, 2005. Doc. 74 ¶¶ 126-128; Doc. 82 ¶¶ 126-128; Doc. 71 ¶ 23; Doc. 79 ¶ 23. At those proceedings, dozens of witnesses offered statements to the City Council, including President and CEO of Planned Parenthood of Western Pennsylvania, Kimberly Evert. Doc. 71 ¶ 24; Doc. 79 ¶ 24. Ms. Evert testified that, in January 2005, the City's budget problems "resulted in the elimination of the police assignment" to the downtown Planned Parenthood. Doc. 72-3, Exhibit C, at p. 8. Ms. Evert testified that "without [police] supervision there has been an increase in unlawful behavior that is putting . . . patients, their families, pedestrians and even protestors at risk." Id. As evidence, Ms. Evert stated that, in 2004, patients made 16 complaints about protestors, whereas from February 2005 to November 2005, "there were 13 cases of aggressive pushing, shoving and hitting, and 30 complaints of harassing behavior that included shoving literature into people's pockets, hitting them with signs and blocking their entrance into the building." Id.

Commander Donaldson of the Pittsburgh Police Department also addressed the City Council on December 7, 2005. Doc. 74 ¶ 133; Doc. 82 ¶ 133. Commander Donaldson stated that, while the City did not arrest any protestors outside 933 Liberty Avenue within the six

months prior to the committee meeting, police had been summoned to that location 22 times in that 6-month period. Doc. 74 ¶ 135; Doc. 82 ¶ 135; Doc. 72-3, Exhibit C, at pp. 52-54. Commander Donaldson explained that "[t]ypically, [the police] are called to mediate confrontations between the people going into the clinic and the protestors or the escorts . . . and other times it was the doorway was obstructed or they followed the people to the doorway or . . . the signs are obstructing the front of the building. . ." Doc. 72-3, Exhibit C, at p. 60. In response to questioning by a Council member, Commander Donaldson acknowledged that, prior to the enactment of the Ordinance, the City already had laws on the books that it could rely upon to arrest and prosecute individuals obstructing traffic, passageways, and doorways. Doc. 74 ¶ 134; Doc. 82 ¶ 134. Commander Donaldson explained, however, that those laws were not as effective as a buffer zone in deterring those who attempted to "block" patients from entering the downtown Planned Parenthood by obstructing their passage before they reached the front door of the building. Doc. 72-3, Exhibit C, at p. 54 ("What I am saying is there are laws currently on the book that would address obstructing traffic or passageways or highway. A number of times what the complaints are at the 933 Liberty Avenue is that they are obstructing the access to the clinic itself. Now there are currently laws for obstructing the doorway, but what this would do is it would set a 15-foot parameter [sic]. So it would be clearly defined. It wouldn't be in front of the obstructing the door per say [sic], but you couldn't be within 15 feet of it. I think it would be along the same lines of either obstructing someone's driveway or blocking someone's driveway. They are two clearly different points. One it makes it difficult to get into your driveway. The other one it makes it impossible to get into your driveway.").

Following these hearings, the City Council passed the Ordinance and the Mayor signed it into law. Doc. 71 ¶ 26; Doc. 79 ¶ 26.

3. Plaintiffs' "Sidewalk Counseling"

Plaintiffs regularly engage in anti-abortion activities outside the buffer zone at the downtown Planned Parenthood. Doc. 71 ¶ 44; Doc. 79 ¶ 44. Their advocacy takes the form of "sidewalk counseling," through which they "seek to have quiet conversations and offer assistance and information about options available . . . other than abortion to people who are about to enter or who exit the facility." Doc. 71 ¶ 46; Doc. 79 ¶ 46. Plaintiff Nikki Bruni is the local head of a group participating in the "Forty Days for Life" movement, a global anti-abortion campaign whose self-described mission is "to bring together the body of Christ in a spirit of unity during a focused 40[-]day campaign of prayer, fasting, and peaceful activism, with the purpose of repentance, to seek God's favor to turn hearts and minds from a culture of death to a culture of life, thus bringing an end to abortion." Doc. 71 ¶ 45; Doc. 79 ¶ 45. Ms. Bruni began sidewalk counseling in early 2010. Doc. 74 ¶ 25; Doc. 82 ¶ 25. Plaintiff Julie Cosentino began sidewalk counseling outside the downtown Planned Parenthood in July 2014, generally going to the clinic on Saturdays. Doc. 71 ¶ 49; Doc. 79 ¶ 49. Plaintiff Cynthia Rinaldi began sidewalk counseling outside the downtown Planned Parenthood approximately 5 to 6 years ago. Doc. 74 ¶ 56; Doc. 82 ¶ 56. Plaintiff Kathleen Laslow began sidewalk counseling outside the downtown Planned Parenthood approximately three years ago. Doc. 74 ¶ 73; Doc. 82 ¶ 73. Patrick Malley began sidewalk counseling in 2010 or 2011, and typically goes to the downtown Planned Parenthood facility on Tuesdays and Fridays. Doc. 74 ¶¶ 91, 93; Doc. 82 ¶¶ 91, 93. None of the Plaintiffs in this case has experience or knowledge about conditions outside the downtown Planned Parenthood before the passage of the Ordinance in 2005 or the modified Ordinance in 2009. Doc. 71 ¶ 11; Doc. 79 ¶ 11.

Abortions are performed at the downtown Planned Parenthood on Tuesdays, Fridays and Saturdays. Doc. 71 ¶ 52; Doc. 79 ¶ 52. On those days, between two to four individuals engage in some form of sidewalk counseling or demonstrating outside of the buffer zone. Doc. 71 ¶¶ 54-55; Doc. 79 ¶¶ 54-55. During Forty Days for Life and other nationally organized clinic protest campaigns, this number may increase to as many as 35 to 40. Doc. 71 ¶ 56; Doc. 79 ¶ 56. Plaintiffs admit that, outside the 15-foot buffer zone, Plaintiffs and their allies are free to walk anywhere on the sidewalk and engage in advocacy, attempting to speak to people who are going to the clinic. Doc. 71 ¶ 68; Doc. 79 ¶ 68. The Ordinance also does not prohibit a willing listener from: (1) slowing down or stopping while approaching the buffer zone in order to listen or talk to Plaintiffs, Doc. 71 ¶ 69; Doc. 79 ¶ 69; (2) exiting the zone in order to listen or talk to Plaintiffs, Doc. 71 ¶ 70; Doc. 79 ¶ 70; or (3) standing inside the buffer zone and having a conversation with Plaintiffs standing a few inches or feet away, outside the zone, Doc. 71 ¶ 71; Doc. 79 ¶ 71. Plaintiffs also admit that the Ordinance does not prohibit them from: (1) attempting to engage a person leaving the clinic in a discussion, as that person walks down the sidewalk, Doc. 71 ¶ 72; Doc. 79 ¶ 72; (2) beginning a conversation with a person and continuing that conversation outside the buffer zone for as long as they want, Doc. 71 ¶ 73; Doc. 79 ¶ 73; or (3) walking with a willing listener to a calmer or quieter location, anywhere outside the buffer zone, to talk further. Doc. 71 ¶ 74; Doc. 79 ¶ 74.

Several of the Plaintiffs testified or declared that they have had trouble communicating with people outside the downtown Planned Parenthood because of street or traffic noise. Doc. 71 ¶¶ 89, 90; Doc. 79 ¶¶ 89, 90. Plaintiff Cosentino testified, however, she has never had trouble communicating with or trying to get a message to people because of street noise or traffic noise. Doc. 71 ¶ 90; Doc. 79 ¶ 90. Plaintiffs also cite no specific instances where someone has told any

of Plaintiffs that they were unable to hear Plaintiffs' message because of traffic noise or the distance due to the buffer zone. Doc. 71 ¶ 91; Doc. 79 ¶ 91. Furthermore, at the preliminary injunction hearing in December 2014, Plaintiff Bruni admitted she had no evidence that the buffer zone impeded her from talking with willing listeners. Doc. 71 ¶ 58; Doc. 79 ¶ 58 (citing Hr'g Tr. 32 ("THE COURT: . . . What evidence do you have that people who desire to engage in close conversation with you are not doing so because of the buffer zone? THE WITNESS: I don't have any.")). Plaintiff Bruni also testified that, between 2009 and the date the Complaint was filed, she has been able to communicate her message to the intended recipients "occasionally." Doc. 71 ¶ 59; Doc. 79 ¶ 59. She testified that, rarely, women inside the buffer zone will come out of the zone to have a conversation with her. Doc. 71 ¶ 60; Doc. 79 ¶ 60. She admits that sometimes women going to the clinic refuse to talk to her, no matter what her distance from them. Doc. 71 ¶ 61; Doc. 79 ¶ 61.

Since approximately 2011, Plaintiff Bruni has been keeping a log of instances where people approaching the Planned Parenthood clinic have reportedly been persuaded not to have abortions. Doc. 71 ¶ 62; Doc. 79 ¶ 62. The log is titled "Log of Saved Babies from abortion at Planned Parenthood, 933 Liberty Avenue, Pittsburgh." Doc. 71 ¶ 62; Doc. 79 ¶ 62. This log records dozens of instances of sidewalk counselors not only communicating their message to others but reportedly persuading people to not have abortions. Doc. 71 ¶ 63; Doc. 79 ¶ 63. Plaintiff Bruni has also "taken a few women to the Crisis Pregnancy Center" after encountering them at the Planned Parenthood clinic. Doc. 71 ¶ 67; Doc. 79 ¶ 67. Likewise, Plaintiff Rinaldi has "often" accompanied women "to nearby Catholic Charities, in order to connect them to resources such as adoption assistance, monetary assistance, food, education, and day care." Doc. 71 ¶¶ 51, 65; Doc. 79 ¶¶ 51, 65; Doc. 74 ¶ 58; Doc. 82 ¶ 58.

**B.**     <u>Procedural History</u>

By way of background and procedural history, at the time the Pittsburgh City Council

enacted the Ordinance, it contained the following two provisions:

> § 623.03 – EIGHT FOOT PERSONAL BUBBLE ZONE. No person shall knowingly approach another person within eight (8) feet of such person, unless such other person consents, for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education or counseling with such other person in the public way or sidewalk area within a radius of one hundred (100) feet from any entrance door to a hospital and/or medical office/clinic.

> § 623.04 – FIFTEEN FOOT BUFFER ZONE. No person or persons shall knowingly congregate, patrol, picket or demonstrate in a zone extending fifteen (15) feet from any entrance to the hospital and or health care facility. This section shall not apply to police and public safety officers, fire and rescue personnel, or other emergency workers in the course of their official business, or to authorized security personnel employees or agents of the hospital, medical office or clinic engaged in assisting patients and other persons to enter or exit the hospital, medical office, or clinic.

Pittsburgh, Pa., Code tit. 6, §§ 623.03-04.

Shortly after taking effect, the Ordinance was challenged as, *inter alia*, facially invalid

under the First Amendment. <u>Brown v. City of Pittsburgh</u>, 543 F. Supp. 2d 448 (W.D. Pa. 2008)

(Fischer, J.). The district court denied the plaintiffs' Motion for a Preliminary Injunction and

dismissed several counts of the complaint. <u>Id</u>. The plaintiffs appealed, and the Court of Appeals

for the Third Circuit affirmed in part, reversed in part and dismissed in part. <u>Brown v. City of

Pittsburgh</u>, 586 F.3d 263 (3d Cir. 2009). The Court of Appeals held that the eight foot bubble

zone (the "bubble zone") and the fifteen foot buffer zone (the "buffer zone") each individually

passed constitutional muster, but when considered in combination, imposed a facially

unconstitutional burden on free speech. <u>Id</u>. The Court of Appeals remanded the case back to

district court for further proceedings. <u>Id</u>.

Post-remand, the district court ordered that the bubble zone provision at section 623.03 be "permanently enjoined *in toto*." Injunction at ¶ 1. Section 623.04, creating the fixed buffer zone, remained, although the Injunction required that the buffer zone provision be construed to prohibit "all persons" from picketing and demonstrating within the boundaries of the buffer zone. Id. at ¶ 2; see Brown, 586 F.3d at 275 ("We find § 623.04 amenable to the content-neutral construction urged by the City, that is, an interpretation prohibiting even the exempted classes of persons from 'picketing or demonstrating' within the buffer zone.") (internal alterations omitted). Accordingly, the exemption for "police and public safety officers, fire and rescue personnel, or other emergency workers in the course of their official business, or to authorized security personnel employees or agents of the hospital, medical office or clinic engaged in assisting patients and other persons to enter or exit the hospital, medical office, or clinic" does not permit those persons to engage in "any action, activity or signage in the form of picketing or demonstrating." Injunction at ¶ 2. The Injunction further requires that the City provide Pittsburgh City Police with oral and written training materials regarding enforcement of the Ordinance. Id. at ¶ 3. Finally, as discussed, the Injunction provides that the City must "clearly mark the boundaries of any 15 foot buffer zone in front of any hospital, medical office or clinic prior to the enforcement of the Ordinance." Id. at ¶ 5.

On June 26, 2014, the Supreme Court issued its decision in McCullen v. Coakley, striking down the amended Massachusetts Reproductive Health Care Facilities Act (the "MRHCA") as insufficiently narrowly tailored to achieve the Commonwealth's legitimate government interests. 134 S.Ct. 2518 (2014). The MRHCA, as amended, "ma[de] it a crime to knowingly stand on a 'public way or sidewalk' within 35 feet of an entrance or driveway to any 'reproductive health care facility,' defined as 'a place, other than within or upon the grounds of a

hospital, where abortions are offered or performed." Id. at 2522. On September 4, 2014, Plaintiffs filed a complaint (the "Complaint") lodging both facial and as applied challenges to the Ordinance, in light of McCullen. Compl. at ¶ 1 (Doc. 1). Plaintiffs also sought a preliminary injunction to prevent the City from enforcing the Ordinance against them. The City responded by filing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Following a hearing on the preliminary injunction motion, this Court granted the City's motion to dismiss Plaintiffs' facial challenges to the Ordinance under the First Amendment and the Due Process Clause of the Fourteenth Amendment. (Doc. 28). In addition, the Court denied the Plaintiffs' motion for a preliminary injunction. (Id.) After the District Court's ruling, the Plaintiffs moved to voluntarily dismiss their as-applied challenges to the Ordinance, their claim under the Equal Protection Clause, and their claim of selective enforcement against the Mayor of Pittsburgh. (Doc. 29).

Plaintiffs appealed the Court's dismissal of their First Amendment and Due Process claims against the City to the Court of Appeals for the Third Circuit.[1] On June 1, 2016, the Third Circuit vacated the dismissal of Plaintiffs' First Amendment claims "so that they may be considered after appropriate development of a factual record." Bruni v. City of Pittsburgh, 824 F.3d 353, 357 (3d Cir. 2016). The Court of Appeals held that this Court erred in relying on materials presented outside the pleadings—including testimony from the preliminary injunction hearing—in dismissing the Complaint, and stated that, at the motion to dismiss stage, the Court must credit Plaintiffs' allegations that, *inter alia*, the Ordinance "prohibits Plaintiffs and others from effectively reaching their intended audience," that "[t]he zones created by the Ordinance make it more difficult [for the] Plaintiffs to engage in sidewalk counseling, prayer, advocacy, and other expressive activities," and that the Ordinance "will cause conversations between the

---

[1] Plaintiffs did not appeal the Court's denial of their preliminary injunction motion.

Plaintiffs and those entering or exiting the facilities to be far less frequent and far less successful." Id. at 368. The Court of Appeals explained that, "taking those allegations as true, the burden on the Plaintiffs' speech is akin to that imposed upon the petitioners in McCullen," and thus the City must satisfy the narrow tailoring analysis by demonstrating "**either that substantially less-restrictive alternatives were tried and failed, or that the alternatives were closely examined and ruled out for good reason.**" Id. at 370.

Following remand, the parties conducted discovery on the relevant issues, and, on June 30, 2017, filed the instant cross motions for summary judgment, which are now ripe for adjudication. (Docs. 68 & 69).

**C.**    **Analysis**

1.   First Amendment Free Speech and Free Press Claim

The Court will first consider Plaintiffs' facial challenges to the Ordinance under the Free Speech and Free Press Clauses of the First Amendment.[2] "The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'" Reed v. Town of Gilbert, Ariz., 135 S. Ct. 2218, 2226 (2015) (quoting U.S. Const., Amdt. 1). The animating purpose behind the First Amendment "lies [in] the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." Turner Broad. Sys., Inc. v. F.C.C., 512 U.S. 622, 641 (1994). Thus, "a government, including a municipal government vested with state authority, 'has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" Reed, 135 S. Ct. at 2226 (quoting Police Dept. of Chicago v. Mosley, 408 U.S. 92, 95

---

[2] The Court applies the same analysis to Plaintiffs' challenges under the Free Speech and Free Press Clauses. As the Court of Appeals held in Bruni, "Plaintiffs' free press claim is, in this context, properly considered a subset of their broader free speech claim, given that the Freedom of the Press Clause and the Free Speech Clause both protect leafleting from government interference." Bruni, 824 F.3d at 373.

(1972)). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." Id. (citations omitted). "In contrast, [laws] that are unrelated to the content of speech are subject to an intermediate level of scrutiny, [ ] because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." Turner Broad. Sys., 512 U.S. at 642 (citing Clark v. Community for Creative Non–Violence, 468 U.S. 288, 293 (1984)).

i.   Whether the Ordinance is Content-Based or Content-Neutral

In Bruni, the Third Circuit instructed this Court on remand "to examine Reed and its effect on the content-neutrality analysis to decide whether that case compels a break from Brown's holding that the Ordinance is a content-neutral restriction on speech." Bruni, 824 F.3d at 365 n.14. Plaintiffs argue that the United States Supreme Court's holding in Reed requires that strict scrutiny be applied to the Ordinance because it prohibits certain types of speech—congregating, patrolling, picketing, and demonstrating—while permitting other speech such as "asking for directions" or "talking about the weather." Doc. 73 at 19-20. The Court disagrees.

In Hill v. Colorado, the Supreme Court found that a statute which prohibits engaging in "oral protest, education, or counseling" with individuals attempting to enter a health care facility was content-neutral, despite not restricting casual speech such as saying "good morning" in the same area. Hill, 530 U.S. at 724. The Hill Court found the statute in question content-neutral because its "restrictions appl[ied] equally to all demonstrators, regardless of viewpoint, and the statutory language ma[de] no reference to the content of the speech." Id. at 719-20. The Court acknowledged that "the content of the oral statements made by an approaching speaker must sometimes be examined to determine whether the knowing approach is covered by the statute,"

but found that "it is unlikely that there would often be any need to know exactly what words were spoken in order to determine whether sidewalk counselors are engaging in oral protest, education, or counseling rather than pure social or random conversation" and that a "cursory examination" did not render the statute facially content-based." Id. at 721-22. Citing to Hill, the Court of Appeals in Brown held that the Ordinance at issue in this case is content-neutral. Brown, 586 F.3d at 273, 275.

Contrary to Plaintiffs' argument, Reed does not change this analysis. As an initial matter, Reed did not overturn its prior holdings in Hill, either expressly or implicitly, and thus Hill remains good law. Indeed, the Reed Court affirms Hill's central holding that government can still enact reasonable content-neutral time, place and matter restrictions. 135 S.Ct. at 2228-29. Specifically, Justice Alito, in a concurrence joined by Justices Kennedy and Sotomayor, listed a variety of content-neutral sign restrictions that would be permissible under the decision. Id. at 2233. Most notably, Justice Alito recognized that content-neutral location restrictions also are still permitted. Id.

Furthermore, the Ordinance at issue here is entirely distinguishable from the one at issue in Reed, which explicitly distinguished signs based upon content. Id. at 2224-25. As the Reed Court explained, the Town of Gilbert's complex Sign Code exempted twenty-three categories of signs—based on their content—from the town's general ban on posting outdoor signs, and made additional content distinctions among the categories of exempted signs, including several content-based distinctions among event-related signs. Id. In particular, the Sign Code gave different amounts of leeway to event-related signs depending on whether the event was, for example, political, commercial, construction-related, "special-event," religious or charitable. Political signs, including any "temporary sign designed to influence the outcome of an election

called by a public body," enjoyed relatively generous time limits; they could be posted for up to sixty days before a primary election, and, if the candidate to which they referred advanced to the general election, they could remain posted until fifteen days following the general election.  Id. at 2225.  In contrast, the Sign Code gave least favorable treatment to the kind of sign that the petitioner church in Reed sought to use: "Temporary Directional Signs Relating to a Qualifying Event."  Id.  Such a sign, defined as one that directed people to any "assembly, gathering, activity, or meeting sponsored, arranged, or promoted by a religious, charitable, community service, educational, or other similar non-profit organization," could only be displayed for twelve hours before the event, and had to be removed within an hour after the event.  Id.

> The Reed Court explained:
>
> The restrictions in the Sign Code that apply to any given sign thus depend entirely on the communicative content of the sign.  If a sign informs its reader of the time and place a book club will discuss John Locke's Two Treatises of Government, that sign will be treated differently from a sign expressing the view that one should vote for one of Locke's followers in an upcoming election, and both signs will be treated differently from a sign expressing an ideological view rooted in Locke's theory of government.  More to the point, the Church's signs inviting people to attend its worship services are treated differently from signs conveying other types of ideas.
>
> Id. at 2227.

The Supreme Court emphasized that the Sign Code's distinctions did not merely "hinge on 'whether and when an event is occurring,'" and did not just "permit citizens to post signs on any topic whatsoever within a set period leading up to an election."  Id. at 2231.  Rather, the Code impermissibly required town officials to examine each sign to determine whether, for example, it was "designed to influence the outcome of the election" and so had to come down within fifteen days of the election, or was more generally "ideological," in which case no time limit applied.  Id. at 2231.  Pittsburgh's Ordinance does no such thing.  The Ordinance does not advantage one message over another based upon content.  Rather, as the Injunction specifies, the

buffer zone applies equally to all messages.  Furthermore, as the <u>Hill</u> Court held, members of

law enforcement can identify congregating, patrolling, picketing, and demonstrating without

knowing or needing to ascertain the content of the speech.  <u>See</u> <u>Hill</u>, 530 U.S. at 721.  Because

"congregating, patrolling, picketing, and demonstrating" all involve obvious visual

manifestations, law enforcement can determine whether the Ordinance is being violated by

merely observing individuals within the restricted zones.

For these reasons, this Court continues to hold, as the Court of Appeals did in <u>Brown</u>,

that the Pittsburgh Ordinance is a content-neutral time, place or manner restriction upon speech.

    ii.  <u>Application of Intermediate Scrutiny</u>

Because the Ordinance is content-neutral, it is subject to intermediate scrutiny.   As the

<u>McCullen</u> Court explained:

> [f]or a content-neutral time, place or manner regulation to be narrowly
> tailored, it must not 'burden substantially more speech than is necessary to
> further the government's legitimate interests.' Such a regulation, unlike a
> content-based restriction of speech, 'need not be the least restrictive or least
> intrusive means of' serving the government's interests.  But the government
> still 'may not regulate expression in such a manner that a substantial portion
> of the burden on speech does not serve to advance its goals.'

134 S.Ct. at 2535 (quoting <u>Ward</u>, 491 U.S. at 798-799); <u>see also</u> <u>Brown</u>, 586 F.3d at 276-77 ("As

a content-neutral time, place and manner regulation, the buffer zone is constitutionally valid if it

is narrowly tailored to serve the government's significant interest and leaves open ample

alternative channels of communication.  The zone may be narrowly tailored even if it is not the

least restrictive or least intrusive means of serving those interests. . . . 'Government may not

regulate expression in such a manner that a substantial portion of the burden on speech does not

serve to advance its goals.'") (citing <u>Hill</u>, 530 U.S. at 725-26).

Plaintiffs do not dispute that the government's interests in enforcing the Ordinance are significant. See Bruni, 824 F.3d at 368 (noting that "Plaintiffs in the present case do not dispute the significance of the City's interests," such as "ensuring patients have 'unimpeded access to medical services,' eliminating the 'neglect' of other law enforcement needs, and letting the City provide 'a more efficient and wider deployment of its services.' Pittsburgh Pa., Code § 623.01.") As the Supreme Court repeatedly has held, "ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting a woman's freedom to seek pregnancy-related services" are significant governmental interests. McCullen, 134 S.Ct. at 2535 (quoting Schenck v. Pro–Choice Network, 519 U.S. 357, 376 (1997), then citing Madsen, 512 U.S. at 767–68)). Not only does the government have "undeniably significant interests in maintaining public safety on those same streets and sidewalks, as well as in preserving access to adjacent healthcare facilities," but "[t]he buffer zones clearly serve these interests." McCullen, 134 S.Ct. at 2535, 2541. Thus, the only issue in dispute is whether the City's regulation "burden[s] substantially more speech than is necessary to further the government's legitimate interests." McCullen, 134 S. Ct. at 2535 (quoting Ward, 491 U.S. at 799).

In Bruni, the Majority and Judge Fuentes, concurring, agreed that "that the degree of burden on speech [by Pittsburgh's buffer zone] is less than that in McCullen, because the zones in Massachusetts were larger, applied state-wide, and limited any entry into the prohibited areas." Bruni, 824 F.3d at 368 n.15; see also id. at 382-385. The Majority, however, declined to "contrast[] the two laws in lengthy dicta" because the Majority and Concurrence agreed that the allegations, taken as true, survived dismissal. Id. at n.15. At the summary judgment stage, however, the Court need not accept the parties' conclusory allegations as true. Schoch v. First

18

Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990). Rather, the Court must consider the entire evidentiary record, crediting the evidence presented by the non-moving party and drawing all justifiable inferences in its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). Here, the Court finds that the undisputed evidence of record demonstrates that the Ordinance, unlike the ordinance at issue in McCullen, imposes only a minimal burden on Plaintiffs' speech.

The Court first notes that the buffer zone in this case is considerably smaller that the buffer zone at issue in McCullen. Although the Bruni Court clarified that this difference in size is not dispositive, the Majority affirmed that size is "one feature" in determining "the burden on speech that such zones impose." 824 F.3d at 368. The McCullen Court noted that the Massachusetts legislature pursued their interests "by the extreme step of closing a *substantial portion* of a traditional public forum to all speakers." McCullen, 134 S.Ct. at 2541 (emphasis added). Specifically, the Court noted that MRHCA authorized overlapping zones around entrances and driveways creating speech-free areas as much as 93 feet and 100 feet long, respectively. Id. at 2527-28. In contrast, here, the Ordinance does not close a "substantial portion" of the public sidewalk. Rather, as Judge Fuentes correctly calculated in his Concurrence, "the radius of the Pittsburgh buffer is less than half the radius of the Massachusetts buffer, and creates a zone whose total area is less than one-fifth the area of the Massachusetts zone. (Put differently, the Massachusetts zone was 2.3 times longer, and its total area was 5.4 times larger.)." Bruni, 824 F.3d at 382.

Furthermore, unlike in McCullen, there is undisputed evidence in this case that Plaintiffs are able to communicate their anti-abortion message using their preferred form of expression— *i.e.*, sidewalk counseling. The McCullen Court noted that, at certain locations, the MRHCA

forced sidewalk counselors to cross the street from the abortion clinics where they sought to counsel — silencing their conversational speech and foreclosing their ability to place leaflets close to patients' hands. 134 S.Ct. at 2527-28. Here, in contrast, Plaintiffs sidewalk counsel immediately outside the boundary of the buffer zone – they are not pushed to the other side of the street. Doc. 71 ¶ 68; Doc. 79 ¶ 68. Nonetheless, several Plaintiffs state that the buffer zone "exacerbates the difficulty of engaging in close, one-on-one conversations outside the Planned Parenthood facility due to 'loud' street noise along Liberty Avenue," and that they must "raise their voice or even shout to be heard by people 15 feet or more away." Doc. 74 at ¶¶ 96, 165-166. However, Plaintiff Cosentino testified at her deposition she has never had trouble communicating or trying to get a message to people because of street noise or traffic noise. Doc. 71 ¶ 90; Doc. 79 ¶ 90. Furthermore, at the preliminary injunction hearing in December 2014, Plaintiff Bruni admitted she had no evidence that the buffer zone impeded her from talking with willing listeners. Doc. 71 ¶ 58; Doc. 79 ¶ 58 (citing Hr'g Tr. 32 ("THE COURT: . . . What evidence do you have that people who desire to engage in close conversation with you are not doing so because of the buffer zone? THE WITNESS: I don't have any.")). Plaintiffs also cite no specific instances where someone has told any of Plaintiffs that they were unable to hear Plaintiffs' message because of traffic noise or the distance due to the buffer zone. Doc. 71 ¶ 91; Doc. 79 ¶ 91. Plaintiffs further admit that, rather than yell at a potential patient arriving from the other side of the buffer zone, they can walk through the buffer zone in an attempt to reach that person on the other side. Doc. 71 ¶ 87; Doc. 79 ¶ 87. Thus, even crediting Plaintiffs' testimony, the Court finds that Plaintiffs have not demonstrated that their ability to engage in one-on-one conversations with patients is substantially burdened by the presence of the buffer zone.[3]

---

[3] Plaintiffs further contend that, when relegated to any distance away from the entrance to the downtown Planned Parenthood, it becomes more difficult for them to identity who is a patient

Moreover, Plaintiffs' own records reflect not only that they are able to communicate with patients, but, in some instances, have accomplished their intended goal of persuading women not to have abortions. Doc. 71 ¶¶ 62-67; Doc. 79 ¶¶ 62-67. Plaintiffs speculate that they would be able to communicate with more women, and perhaps persuade more of them not to have abortions, if they could walk alongside patients all the way to and from the entrance of the clinic. But Plaintiffs offer no concrete evidence to support this claim. Unlike in <u>McCullen</u>, where the plaintiffs engaged in sidewalk counseling both before and after the MRHCA went into effect and stated that the number of people they reached sharply declined after the larger buffer zones were imposed, Plaintiffs admit that they did not engage in sidewalk counseling at the downtown Planned Parenthood before the Ordinance was passed and thus have no basis to compare the efficacy of their speech with and without a buffer zone. Doc. 71 ¶ 11; Doc. 79 ¶ 11. Plaintiffs further admit that they have no power or right to force unwilling listeners to engage in conversation with them. Thus, the fact that many people entering and exiting the clinic do not wish to speak to Plaintiffs or take literature from them is not evidence that the Ordinance substantially limits Plaintiffs' speech but rather, more likely, that these individuals simply do not wish to engage with Plaintiffs.[4] <u>See</u> <u>Hill</u>, 530 U.S. at 718 ("[N]o one has a right to press even

---

and who is not. Doc. 74 at ¶ 161. However, as the Court previously found, this is not a burden on their right to free speech. If anything, Plaintiffs engage in more speech, not less, in an effort to disseminate their message to all potential patients. A right to engage in normal conversation and leaflet on a public sidewalk does not equate to a right to know if those with whom you communicate are, indeed, your target audience.

[4] For instance, Plaintiff Bruni testified that, on some occasions, people inside the buffer zone who observe sidewalk counselors offering them literature reach out their hands to receive such literature, expecting the sidewalk counselors to come to them. Doc. 74 ¶ 167. Ms. Bruni speculates that, because the sidewalk counselors cannot enter the buffer zone, people inside the buffer zone could be less likely to take the sidewalk counselors' literature. <u>Id</u>. Ms. Bruni admits, however, that there is nothing preventing her from speaking to these individuals and explaining to them that they have to walk outside the buffer zone to receive the literature. Doc. 75, Exh. C, 41:24-42:5; 42:19-20. She also admits there is no physical barrier preventing them

'good' ideas on an unwilling recipient.") (quoting Rowan v. United States Post Office Dept., 397 U.S. 728, 738 (1970)).

In short, the undisputed evidence in this case demonstrates that the Ordinance places only a minimal burden on Plaintiffs' First Amendment free speech rights.

### iii. The City's Consideration of Less Restrictive Alternatives

As discussed, the Court of Appeals in Bruni held that Plaintiffs had adequately alleged in their Complaint that the Ordinance posed a "significant burden on speech." Bruni, 824 F.3d at 369. Thus, the Third Circuit found that "the City has the same obligation to use less restrictive alternatives to its buffer zone as the Commonwealth of Massachusetts had with respect to the buffer zone at issue in McCullen." Id. However, in light of this Court's finding, based on a more developed evidentiary record, that the 15-foot buffer zone does *not* substantially burden speech, the City does not have this same obligation. As Judge Fuentes explains in his Concurrence: "The adverb supplies the test: the operative question, in this case and others, is whether the proposed alternatives would burden ***substantially*** less speech while still furthering the government's interests." Bruni, 824 F.3d at 379 (emphasis in original). Here, given the Court's finding that the Ordinance's restriction on speech is minimal, the Court finds that the alternatives considered in McCullen are not, in fact, *substantially* less-restrictive. Accordingly, the City has no obligation to demonstrate that it tried—or considered and rejected—any such alternatives.

However, even assuming, *arguendo*, that the City had such an obligation, the Court finds that it has met its burden. First, contrary to Plaintiffs' contention, the Court finds undisputed evidence in the record that the City enacted the Ordinance to address an "actual problem" in need

from walking outside the buffer zone. Id. Given Ms. Bruni's admission that patients interested in the literature could easily walk outside the buffer zone to receive it, the Court can reasonably infer that their decision not to do so reflects their lack of interest in the material.

of solving. Doc. 73 at 13 (citing United States v. Playboy Entm't Grp., 529 U.S. 803, 823 (2000)). As discussed, during the City Council meeting on December 7, 2005, the President and CEO of Planned Parenthood of Western Pennsylvania, Kimberly Evert, testified that the number of complaints went up considerably after the City stopped stationing police at the downtown Planned Parenthood, explaining that between February 2005 to November 2005, "there were 13 cases of aggressive pushing, shoving and hitting, and 30 complaints of harassing behavior that included shoving literature into people's pockets, hitting them with signs and blocking their entrance into the building." Doc. 72-3, Exhibit C, at p. 8. Moreover, Commander Donaldson of the Pittsburgh Police Department testified that, while the City did not arrest any protestors outside 933 Liberty Avenue within the six months prior to the committee meeting, police had been summoned to that location 22 times in that 6-month period. Doc. 74 ¶ 135; Doc. 82 ¶ 135; Doc. 72-3, Exhibit C, at Pages 52-53. This evidence is sufficient to justify the City's passage of the Ordinance. See Bruni, 824 F.3d at 370 ("[A]nalysis under intermediate scrutiny affords some deference to a municipality's judgment in adopting a content-neutral restriction on speech.").

Furthermore, the Court finds sufficient evidence that the City "seriously considered and reasonably rejected 'different methods that other jurisdictions have found effective.'" Bruni, 824 F.3d at 371 (citing McCullen, 134 S.Ct. at 2539). Here, the legislative record clearly shows that the City tried, and considered and rejected, at least two alternative measures prior to enacting the Ordinance. First, the City Council considered Ms. Evert's testimony that the City had previously stationed police at the downtown Planned Parenthood, but that this practice had become too expensive in light of the City's budget problems. Doc. 72-3, Exhibit C, at p. 8. Second, Commander Donaldson testified that the enforcement of the City's anti-obstruction laws would

not be as effective as a buffer zone in deterring those who attempted to "block" patients from entering the clinic by obstructing their passage before they reached the front door of the building. Doc. 72-3, Exhibit C, at p. 54. After hearing testimony about these two alternative measures (*i.e.,* maintaining an overtime police presence, and enforcing existing anti-obstruction statutes), the City Council voted to adopt the Ordinance. In doing so, the City Council implicitly rejected the alternatives discussed, presumably for the reasons stated on the record.

Plaintiffs argue that the City should have considered any number of other alternatives prior to adopting the Ordinance, including targeted injunctions and/or the enforcement of anti-harassment statutes. Doc. 73 at 14-18. However, the Bruni Court affirmed that the City need not demonstrate that "it has tried or considered every less burdensome alternative to its Ordinance." Bruni, 824 F.3d at 371 (citing Ward, 491 U.S. at 800). To the contrary, the Court of Appeals took pains to give "repeated recognition of the broad principle of deference to legislative judgments and our explicit assurance that legislatures need not meticulously vet every less burdensome alternative. . . ." Id. at n.18; see also id. ("[W]e mean what we say."). Furthermore, as discussed, in light of the Court's finding that the current law burdens very little speech to begin with, there is no reason to believe that any of these alternative measures would burden *substantially* less speech than does the current Ordinance.

For the reasons discussed above, the Court finds that the Ordinance does not "burden substantially more speech than is necessary to further [the City's] legitimate interests." See McCullen, 134 S. Ct. at 2535. Accordingly, the Court will grant Defendants' Motion for Summary Judgment, and deny Plaintiffs' Motion for Summary Judgment, as to Plaintiffs' facial First Amendment Free Speech and Free Press claims.

2. <u>Overbreadth Claim</u>

Plaintiffs also argue that the Ordinance is facially overbroad "because it authorizes the creation of zones at non-abortion locations where the City does not even claim there has been a justification for banning speech." Doc. 73 at 23.

A statute is overbroad when "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." <u>Bruni</u>, 824 F.3d at 374 (internal quotation marks omitted). The Supreme Court has cautioned that "[f]acial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute." <u>Broadrick v. Oklahoma</u>, 413 U.S. 601, 613 (1973). In <u>Hill</u>, the Supreme Court rejected the plaintiffs' overbreadth challenge to a Colorado statute that created floating buffer zones at the entrances to health care facilities, finding "the comprehensiveness of the statute [to be] a virtue, not a vice, because it is evidence against there being a discriminatory governmental motive." <u>Hill</u>, 530 U.S. at 731. The <u>Brown</u> Court relied on that holding in finding that, to the extent that Brown brought a facial overbreadth challenge, "her attack is foreclosed by <u>Hill</u>." 586 F.3d at 282 n. 21. As this Court previously explained, the <u>McCullen</u> Court did not conduct an overbreadth analysis, and thus <u>Brown</u> and <u>Hill</u>'s application of the overbreadth doctrine remains good law. Nevertheless, in <u>Bruni</u>, the Court of Appeals found that it was premature to dismiss an overbreadth claim "absent a well-supported conclusion regarding the proper scope of the Ordinance." 824 F.3d at 374.

Following discovery, there remains no dispute as to the scope of the Ordinance as modified by this Court's permanent injunction. As the City argues, the Injunction requires a clear demarcation of any buffer zones, and the City has demarcated only two such buffer zones, both located at the entrances of reproductive healthcare facilities. Doc. 74 ¶ 149; Doc. 82 ¶ 149.

Plaintiffs cite no evidence that the City has enforced or attempted to enforce the Ordinance at any other locations. Indeed, in their lawsuit, Plaintiffs focus almost exclusively on a single buffer zone located at the downtown Planned Parenthood. Thus, the Court finds no evidence that, as limited by the Injunction, the current Ordinance raises any overbreath issue, and will grant summary judgment to Defendants on this claim as well.

## II. ORDER

For the reasons stated above, Defendants' Motion for Summary Judgment (Doc. 69) is GRANTED and Plaintiffs' Motion for Summary Judgment (Doc. 68) is DENIED. A judgment order pursuant to Federal Rule of Civil Procedure 58 will follow.


IT IS SO ORDERED.


November 16, 2017                                    s/Cathy Bissoon
                                                    Cathy Bissoon
                                                    United States District Judge


cc (via ECF email notification):

All Counsel of Record